06-5482-cr, 06-5654-cr
USA v. Sanjay Kumar and Stephen Richards (USA)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

(Argued: September 19, 2008          Decided: August 12, 2010)

Docket Nos. 06-5482-cr(L), 06-5654-cr(CON)

--------------------------------------------------------x

UNITED STATES OF AMERICA,

          Appellee,

                    -- v. --

SANJAY KUMAR and STEPHEN RICHARDS,

          Defendants-Appellants.

--------------------------------------------------------x

B e f o r e :  WALKER, SACK, LIVINGSTON, Circuit Judges.

Appeal by Defendants from separate judgments entered in the

United States District Court for the Eastern District of New York

(I. Leo Glasser, Judge), following guilty pleas by Defendants to

several counts of conspiracy, securities and wire fraud,

obstruction of justice, and perjury.  We hold that Richards's

guilty plea was not constitutionally infirm and that he was

properly charged with, and convicted on his guilty plea to,

obstruction of justice.  We therefore AFFIRM Richards's judgment

of conviction in all respects.  We further conclude that the use

of the Sentencing Guidelines in effect at the time of sentencing

to calculate Defendants' Guidelines ranges for their fraud

offenses, rather than the Guidelines in effect at the time of the

commission of those offenses, did not violate the <u>Ex Post Facto</u> clause.  We further conclude that the district court properly calculated the loss amount underlying Defendants' monetary fines and that the district court did not abuse its discretion by denying Kumar an acceptance of responsibility credit in determining his Guidelines range.  We further conclude that the district court erroneously failed to award Richards a two-point reduction for acceptance of responsibility.  Thus, we AFFIRM Kumar's sentence in all respects and VACATE Richards's sentence and REMAND for resentencing.

AFFIRMED in part, VACATED in part, and REMANDED.

Judge Sack dissents in part in a separate opinion.

ERIC R. KOMITEE, Assistant United States Attorney (David C. James, Jason A. Jones, <u>of counsel</u>), <u>for</u> Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., <u>for Appellee</u>.

PAUL SHECHTMAN (Nathaniel Z. Marmur and Kathryn Moore Martin, <u>on the brief</u>), Stillman, Friedman & Shechtman, P.C., New York, N.Y., <u>for Defendant-Appellant Sanjay Kumar</u>.

CHRISTOPHER J. GUNTHER (David M. Zornow, <u>on the brief</u>), Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y., <u>for Defendant-Appellant Stephen Richards</u>.

JOHN M. WALKER, JR., Circuit Judge:

Defendants-Appellants Sanjay Kumar and Stephen Richards appeal from separate judgments of conviction by the district court (I. Leo Glasser, Judge), pursuant to their guilty pleas to several counts of conspiracy, securities and wire fraud, obstruction of justice, and perjury. After accepting their pleas, the district court calculated defendants' Guidelines ranges for their fraud and obstruction offenses pursuant to the Sentencing Guidelines Manual ("Guidelines") in effect at the time of their sentencings, and sentenced Kumar and Richards to non-Guidelines sentences of imprisonment of 144 months and 84 months, respectively, and ordered restitution payments of $800 million and $29 million, respectively.

On appeal, Richards challenges his conviction for obstruction of justice, arguing that the indictment failed to properly charge him with that offense. In addition, Richards attacks his guilty plea to all counts as constitutionally infirm because it resulted from undue coercion by the government. Both defendants argue that, by calculating their Guidelines range according to the Guidelines in effect at sentencing, instead of at the time the fraud offenses were committed, the district court sentenced them in violation of the Ex Post Facto clause. They also claim that the district court improperly denied them acceptance of responsibility credit, and that its orders of

-3-

restitution were based on erroneous loss calculations.

We find no infirmity in Richards's conviction, in the district court's application of the 2005 version of the Guidelines,[1] in the district court's loss determination, or in the denial of Kumar's request for acceptance of responsibility credit at sentencing. We conclude, however, that the district court erroneously denied Richards a reduction on the basis of his acceptance of responsibility and remand for resentencing on that basis.

## BACKGROUND

The following facts are material to this appeal.

Kumar joined Computer Associates ("CA"), a publicly traded corporation, in August 1987 and was elevated to CEO in August of 2000 and to Chairman of the Board of Directors in 2002. Richards joined CA in 1988 and became Head of North American Sales in 1999. During the tenure of both defendants, CA engaged in a fraudulent accounting practice known as the "35-day month," whereby CA backdated contracts executed in the first few days of a financial quarter to recognize that revenue in the prior quarter. The purpose of the 35-day month practice, which began in the 1980s under Kumar's predecessor, was to deceive investors into believing that the company had met or exceeded its quarterly earnings estimates.

---

[1] Judge Sack dissents as to this portion of our opinion.

In February 2002, the United States Attorney's Office ("USAO") and Securities and Exchange Commission ("SEC") began a joint investigation into the 35-day month practice as contravening both accounting principles and federal securities law. As part of its investigation, government investigators sought witness statements from CA personnel. On June 9, 2003, the USAO and SEC requested that CA conduct its own internal investigation into the practice and give the USAO and SEC "direct access" to company employees. CA's outside counsel advised CA to comply fully with the investigation.

On August 25, 2003, the SEC subpoenaed the testimony of ten individuals associated with CA, including Kumar and Richards. The SEC interviews were held at the USAO office in Central Islip, New York. On September 22, 2003, prosecutors and SEC staff told Richards's counsel that Richards was a target of their criminal investigation, and the SEC reiterated its demand that Richards comply with the subpoena for his testimony. In early October 2003, CA told Richards that he would be terminated if he didn't comply with the subpoena. On October 22, 2003, CA's outside counsel interviewed Richards, and the following day, Richards testified before the SEC. Richards falsely denied knowledge of the 35-day month practice during both meetings and in his testimony.

On September 22, 2004, CA entered into a deferred

-5-

prosecution agreement with the USAO and a civil settlement with the SEC. The following day, an indictment charging Richards and Kumar was unsealed. A superceding indictment was filed on May 17, 2005. By this indictment, Richards was charged with both conspiracy to commit, and substantive counts of, securities and wire fraud, as well as filing false public statements with the SEC and perjury. Richards was also charged under 18 U.S.C. § 1512(c) with obstruction of justice arising out of his false exculpatory statements to CA's counsel and the SEC.

The superceding indictment charged Kumar with both conspiracy to commit, and substantive counts of, securities and wire fraud, as well as filing false public statements with the SEC and making false statements to the FBI. Kumar was also charged with obstruction of justice. However, Kumar's obstruction charge (also brought pursuant to 18 U.S.C. § 1512(c)) arose out of different conduct from that of Richards. Specifically, the government alleged that Kumar, in an effort to cover up the existence of the 35-day month practice, lied to CA's outside counsel, instructed CA's general counsel to coach CA employees to lie, authorized CA's general counsel to pay a $3.7 million bribe to an individual to procure his silence, and lied to FBI agents and others during his interview at the USAO's office.

Both Richards and Kumar made various motions to dismiss the

charges against them.  Relevant to this appeal, first they unsuccessfully moved to dismiss the obstruction charges, arguing that their oral statements to government investigators were beyond the reach of 18 U.S.C. § 1512(c), which they claimed was confined to documentary evidence.

Next, Richards moved to suppress his false statements to CA's outside counsel and the SEC, claiming that they were coerced in violation of the Fifth Amendment.  Without addressing the merits, the district court denied the motion on the basis that Richards had not shown "good cause" for failing to timely file the motion to suppress pursuant to the court-ordered deadline.

In April 2006, both defendants pled guilty to all charges and the Probation Department prepared a Presentence Report ("PSR") for each defendant.  Both PSRs calculated defendants' Guidelines ranges based on the instructions provided in the 2005 Sentencing Guidelines, notwithstanding the fact that the 35-day month practice – the basis for the securities fraud charges – ended in 2000.  Richards's PSR arrived at an offense level of 50 and a Guidelines range of life imprisonment, and Kumar's PSR recommended an offense level of 51 and a Guidelines range of life imprisonment.  Both PSRs calculated losses to the public resulting from the 35-day month practice to exceed $400 million.

In August 2006, the defendants submitted objections to the Guidelines calculations in the PSR.  The defendants argued that

-7-

application of the 2005 Sentencing Guidelines (effective November 2005) to the securities fraud offenses instead of the 1998 Sentencing Guidelines (effective November 1998) would violate the Ex Post Facto clause because the 2005 Guidelines contained several significant enhancements for securities fraud that were not in effect when the fraud offenses were committed.[2] The defendants further objected to the $400 million victim loss calculation as overinflated.[3]

In November 2006, the district court sentenced both defendants under the 2005 Guidelines. At sentencing, the district court rejected both defendants' objections to their PSRs, finding that (1) because the Guidelines were advisory, the Ex Post Facto clause was not implicated by sentencing decisions,

---

[2] According to Kumar, the 35-day month practice ended in October 2000, when "[CA's] New Business Model brought [it to] an end." Kumar Br. 16. The government does not dispute that the 35-day month practice ended in October 2000, and the indictment cites no overt acts of securities fraud by either defendant after May 2000. Accordingly, the 1998 Guidelines Manual, which was effective between November 1, 1998, and November 1, 2000, was the version of the Manual in effect at the time the defendants' fraud offenses were completed.

[3] Individually, and unlike Richards, Kumar also objected to the PSR's recitation of his offense conduct, insofar as it alleged that he had erased data from his computer and engaged in fraudulent transactions as CA's CEO. On October 23, 2006, the district court held a separate Fatico hearing to consider Kumar's individual objections. After two days of testimony, Kumar withdrew all of his individual objections to the PSR before the district court could rule on them (although he maintained objections that he held jointly with Richards and the government agreed to withdraw one contested allegation in the PSR).

and (2) the $400 million figure was not erroneous, as it was based on the persuasive testimony of the government's expert witness. The district court also rejected an application by both defendants for a two-level reduction to the Guidelines' base offense level for acceptance of responsibility. The district court found that Kumar had not sufficiently accepted responsibility for his crimes to warrant the departure and that Richards's acceptance of responsibility was "[un]timely" because he pled guilty "just . . . two weeks before the trial was to begin." See Richards Sentencing Tr. 15:14, 16:1-2, Nov. 14, 2006; see also Richards Sentencing Tr. 16:5-6 (noting that, in light of Richards's non-Guidelines sentence, rejection of the two-level reduction "ma[de] very little difference insofar as what [his] sentence [was] going to be").[4]

The district court then decided to impose non-Guidelines sentences for both defendants, sentencing downwardly from the Guidelines' calculation of life imprisonment. The court found that "[t]o impose th[e] sentence[s] [recommended by the

---

[4] The district court also rejected a two-level enhancement for obstruction of justice, concluding that the defendants had "pl[ed] guilty to that crime in other counts and this enhancement is superfluous and may even be regarded as double counting." See Kumar Sentencing Tr. 65:18-20, Nov. 2, 2006; see also Richards Sentencing Tr. 16:8-13. It appears that the court erred in not adding two points for obstruction, see, e.g., United States v. Fiore, 381 F.3d 89, 95 (2d Cir. 2004); Kumar even concedes the error. However, the government has not cross-appealed this issue and, thus, has waived the issue on appeal. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).

-9-

Guidelines] in this case would shock the conscience of this Court . . . . [and] the conscience of the reasonable person." Kumar Sentencing Tr. 65:24-66:1, Nov. 2, 2006; see also Richards Sentencing Tr. 25:5-9. Accordingly, the court sentenced Kumar and Richards to imprisonment terms of twelve years and seven years, respectively.

Defendants appealed.

**DISCUSSION**

**I. Was Richards Properly Convicted Of Obstruction Of Justice?**

Richards claims that he was "erroneously convicted" of obstruction of justice because 18 U.S.C. § 1512(c),[5] the statute under which he was charged, only covers the destruction of physical evidence, and not the charged conduct of "providing false oral responses under oral questioning from CA's outside counsel and the SEC."[6] Richards Br. 18. The government argues

---

[5] Section 1512(c) provides:

Whoever corruptly –

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

[6] The government's brief repeatedly refers to "defendants'" statutory argument, thus implying that both Kumar and Richards

-10-

that Richards's challenge is barred by his guilty plea, and that, in any event, § 1512(c)(2) covers all obstructive conduct, not just destruction of physical evidence. While the government may be correct that § 1512(c)(2) applies to testimonial evidence, we need not reach this issue of first impression in this circuit, because we find that any defect asserted is non-jurisdictional and was waived by the guilty plea.

A plea of guilty "waive[s] any and all non-jurisdictional defects in the indictment." United States v. Moloney, 287 F.3d 236, 239 (2d Cir. 2002). To challenge the court's jurisdiction, "the defendant who has pleaded guilty must establish that the face of the indictment discloses that the count or counts to which he pleaded guilty failed to charge a federal offense." Hayle v. United States, 815 F.2d 879, 881 (2d Cir. 1987). Thus, to attack a conviction post-plea, a defendant must establish that the district court lacked the "power to entertain the prosecution." Id. at 882; see United States v. Cotton, 535 U.S. 625, 630 (2002) (defining "jurisdiction" as "the courts' statutory or constitutional power to adjudicate the case").

Richards claims that he has met this burden by showing that § 1512(c)(2) does not proscribe false testimony, thereby establishing that he did not violate a federal statute. However, regardless of whether Richards's false testimony violated §

challenge their convictions for obstruction of justice. However, only Richards challenges his conviction on this basis.

1512(c)(2), it plainly violated § 1503(a), and the indictment charges at least that offense. Because the indictment created federal jurisdiction under § 1503(a), Richards's claim has no jurisdictional significance and thus is waived by his guilty plea.

Section 1503(a) provides, in relevant part, that "[w]hoever corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" is guilty of a criminal violation. 18 U.S.C. § 1503(a). In United States v. Aguilar, 515 U.S. 593, 598 (1995), the Supreme Court interpreted this subsection as a "catchall" intended to prohibit all obstructive behavior. See id. (referring to subdivision four of § 1503(a) as "far more general in scope" than the remainder of the subsection). Courts in this circuit have likewise given § 1503's omnibus clause a generally non-restrictive reading. See, e.g., United States v. Rosner, 352 F. Supp. 915, 919 (S.D.N.Y. 1972) (noting that the omnibus clause "embraces the widest variety of conduct that impedes the judicial process"); see also United States v. Solow, 138 F. Supp. 812, 814 (S.D.N.Y. 1956) (characterizing the omnibus provision as "all-embracing"). Other circuits' readings of § 1503's omnibus clause have been as broad as, or even broader than, the reading in this circuit.[7]

---

[7] See, e.g., United States v. Maloney, 71 F.3d 645, 659 (7th Cir. 1995); United States v. Kenny, 973 F.2d 339, 342-43 (4th

-12-

However, § 1503(a) only prohibits false testimony that has a direct "nexus" to an official government proceeding.  Aquilar, 515 U.S. at 600.  In endorsing a nexus test, the Supreme Court stated that

> [t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. . . .  [T]he act must have a relationship in time, causation, or logic with the judicial proceedings.  In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice. . . .  [I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.

Id. at 599 (internal citations and quotation marks omitted).  The nexus limitation is "best understood as an articulation of the proof of wrongful intent that will satisfy the mens rea requirement of 'corruptly' obstructing or endeavoring to obstruct."  United States v. Quattrone, 441 F.3d 153, 170 (2d Cir. 2006).  Thus, statements made to investigating agents who might or might not testify before a grand jury are insufficient to violate § 1503(a), because false testimony given in anticipation of a purely hypothetical judicial proceeding is not covered by § 1503(a).  See United States v. Bruno, 383 F.3d 65,

Cir. 1992); United States v. London, 714 F.2d 1558, 1566-67 (11th Cir. 1983); United States v. Faudman, 640 F.2d 20, 23 (6th Cir. 1981); United States v. Howard, 569 F.2d 1331, 1333 (5th Cir. 1978); United States v. Walasek, 527 F.2d 676, 679 n.11 (3d Cir. 1975).

-13-

87-88 (2d Cir. 2004); see also United States v. Schwarz, 283 F.3d 76, 109 (2d Cir. 2002).  Nevertheless, a defendant does not need to know with certainty that his conduct would affect judicial proceedings, nor does his conduct need to actually obstruct justice.  Instead, the defendant's conduct must only have the "natural and probable effect of interfering with the due administration of justice."  Aguilar, 515 U.S. at 599 (internal quotation marks omitted).  Section 1503(a) applies where a defendant "inten[ds] to obstruct justice" but "is foiled in some way."  Id. at 601-02.

Here, Richards's conduct easily falls within the ambit of § 1503(a).  Richards lied to the SEC in an attempt to "impede" the SEC's ongoing investigation, which Richards knew was not simply an agency fishing expedition or an "ancillary proceeding" that might or might not result in criminal proceedings.  Id. at 599.  Richards concedes that he knew that criminal proceedings were not merely possible when he made his false statements, but that the government "predicted" that criminal charges would be brought against him prior to his SEC interview.  See Richards Br. 10; see also Post-Argument Letter from Stephen Richards to the Court, dated Sept. 26, 2008 ("Richards Letter"), at 1 ("Richards testified . . . at the [USAO] under the . . . belief that admitting knowledge of the 35 Day Month would incriminate him in securities fraud.").  Richards thus plainly "entertained . . .

-14-

expectations" during his interview at the USAO that his false statements to the SEC would impede impending criminal proceedings brought against him.  <u>Schwarz</u>, 283 F.3d at 109; <u>see</u> <u>United States v. Cueto</u>, 151 F.3d 620, 634 (7th Cir. 1998) (finding nexus to exist where defendant's conduct, which "pre-date[d] the empaneling of the grand jury, . . . corruptly endeavored to obstruct the due administration of justice").[8]  "[I]t is clear

---

[8]    Although "§ 1503's application typically begins after the commencement of formal judicial proceedings," <u>United States v. Novak</u>, 217 F.3d 566, 572 (8th Cir. 2000) (internal quotation marks and emphasis omitted), in this case, Richards concedes that, when he lied, he knew that "formal judicial proceedings" were not only possible or likely, but that the government intended to bring them.  Such obstructive behavior during a federal investigation – whether that investigation is conducted by a grand jury, or by a federal agency like the SEC where there is also a "quite strong, perhaps inescapable" inference that the witness's statements "would be presented to [a] grand jury" – is covered by § 1503(a).  <u>See</u> <u>United States v. Triumph Capital Group, Inc.</u>, 544 F.3d 149, 169 (2d Cir. 2008); <u>see, e.g.</u>, <u>United States v. Giovanelli</u>, 464 F.3d 346, 350-51 (2d Cir. 2006) (per curiam) (obstructive behavior during a grand jury investigation but before indictment sufficient to trigger application of § 1503(a)); <u>see</u> <u>also</u> <u>United States v. Macari</u>, 453 F.3d 926, 939-40 (7th Cir. 2006) (noting that "the <u>Aguilar</u> court did not draw a line between subpoenaed or 'actual' and non-subpoenaed or 'potential' witnesses," but instead "focused on the defendant's intent . . . when he performed the alleged act of lying to investigating FBI agents"); <u>United States v. Davis</u>, 183 F.3d 231, 243 n.3 (3d Cir. 1999) (nexus requirement satisfied where conspirators "knew of <u>or</u> anticipated a grand jury investigation" (emphasis added)); <u>United States v. Vaghela</u>, 169 F.3d 729, 734-35 (11th Cir. 1999) (holding that a conviction for conspiracy to obstruct justice under § 1503 does not require a "judicial proceeding [to] exist[]" at the time of the offense, but only that the defendant "directly intended to prevent or otherwise obstruct the processes of a specific judicial proceeding in a way that is more than merely 'speculative'" (quoting <u>Aguilar</u>, 515 U.S. at 601)); <u>Cueto</u>, 151 F.3d at 634 ("It is well established that investigations undertaken with the intention of presenting evidence before a grand jury are sufficient t constitute 'the due

-15-

that if the representations" made by Richards "had been believed, the grand jury would have been thrown completely off the trail that it was pursuing with respect to" Richards. United States v. Jespersen, 65 F.3d 993, 1001 (2d Cir. 1995). Therefore, there was a sufficiently close "relationship in time, causation, [and] logic" between Richards's conduct and likely judicial proceedings to satisfy § 1503(a)'s nexus requirement. United States v. Reich, 479 F.3d 179, 186 (2d Cir. 2007) (internal quotation marks omitted).

In addition, the indictment fully apprised Richards of the elements of his offense under § 1503(a). Specifically, the indictment stated that

> Richards well knew and believed that certain of the statements he made during the interviews were false and that he otherwise concealed during the interviews information which he knew to be material to the Government Investigations. Richards further well knew, and in fact intended, that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

As the government correctly notes, "[t]he citation of a statutory section number . . . is not a part of the offense, and . . . an allegedly erroneous statutory citation is not a jurisdictional defect." Gov't Br. 11; see Fed. R. Crim. P. 7(c)(3) ("Unless the

administration of justice' under § 1503.") (internal citation and quotation marks omitted)). Cf. United States v. Brenson, 104 F.3d 1267, 1280 (11th Cir. 1997) ("Section 1503 employs the term 'due administration of justice' to provide a protective cloak over all judicial proceedings, irrespective of at what stage in the judicial process the improper activity occurs.").

-16-

defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground . . . to reverse a conviction."). The failure of the indictment to specify § 1503(a), as opposed to § 1512(c)(2), is therefore not grounds for vacating Richards's guilty plea.[9]

Richards's remaining arguments, the government also correctly notes, are "mere corollaries of [his] . . . claim that [he] pleaded to a 'non-offense.'" Gov't Br. 13-14. For example, Richards argues that his guilty plea should be vacated because he was "misinformed of the elements of [his] crime," since, according to Richards, § 1512(c)(2) does not reach testimonial evidence. Richards Br. 19 (citing Bousley v. United States, 523 U.S. 614, 618 (1998)). But Richards's argument rests on the flawed premise that the indictment charged him with a "non-offense." That is not the case here; at most, the charge should have been brought under § 1503(a) instead of § 1512(c)(2), and the indictment fully stated the elements of an offense under that

---

[9] The government may have charged Richards with violating § 1512(c)(2) instead of § 1503(a) due to its concern that a § 1503(a) charge would raise a "Masterpol issue." See Gov't Br. 22 n.8 (citing United States v. Masterpol, 940 F.2d 760 (2d Cir. 1991)). In Masterpol, we held that witness tampering is prohibited only by § 1512, and is not covered by § 1503's omnibus clause. 940 F.2d at 763. The government's concern with respect to Richards's obstruction charge was misplaced. While Masterpol might have presented an obstacle for indicting Kumar, who attempted to bribe a witness, as previously noted, Kumar is not appealing his obstruction of justice conviction. Unlike Kumar, Richards did not engage in witness tampering. Thus, Masterpol is not implicated here.

-17-

section. Vacating Richards's plea is therefore unnecessary, as Richards does not "stand[] convicted of an act that the law does not make criminal." Bousley, 523 U.S. at 620 (internal quotation marks omitted). In any event, because there was no jurisdictional defect in Richards's obstruction charge, his guilty plea waived any ancillary claims based on that charge.

**II. Does Richards's Guilty Plea Bar His Coercion Claim?**

Next, Richards argues that the government violated the Fifth Amendment's prohibition on government-compelled testimony by placing improper pressure on CA to cooperate in the government's investigation that resulted in CA's insistence that Richards either testify before the SEC or be terminated. The district court rejected Richards's motion to suppress his testimony, which was admittedly false and became the basis for the obstruction of justice charge to which Richards pled guilty, as untimely in light of the district court's schedule for motions. On appeal, Richards argues that his guilty plea should not bar his coercion claim because review of his claim is necessary "to preserve the integrity of the judicial process." Richards Br. 32. Richards's coercion claim is easily resolved because the Fifth Amendment does not protect false testimony.

As previously noted, a plea of guilty "waive[s] any and all non-jurisdictional defects in the indictment." Moloney, 287 F.3d at 239. However, this court may overturn a guilty plea on

involuntariness grounds when the defendant shows that his plea "was substantially motivated by a coerced confession." United States ex rel. Ross v. McMann, 409 F.2d 1016, 1023 (2d Cir. 1969) (en banc), vacated on other grounds sub nom. McMann v. Richardson, 397 U.S. 759 (1970).  In addition, a guilty plea that is otherwise "voluntary and intelligent" may be overturned if it contains "constitutional violations" that are "logically inconsistent with the valid establishment of factual guilt." Menna v. New York, 423 U.S. 61, 62 n.2 (1975) (per curiam).

Richards's coercion claim is not viable, because it is based on a fatally flawed premise:  that false statements – whether or not made under coercive circumstances – are protected by the Fifth Amendment.  To the contrary, the Supreme Court has repeatedly held that the Fifth Amendment does not "confer[] a privilege to lie." Brogan v. United States, 522 U.S. 398, 404 (1998).  "[P]roper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely . . . ." United States v. Apfelbaum, 445 U.S. 115, 117 (1980); see also United States v. Wong, 431 U.S. 174, 180 (1977); Bryson v. United States, 396 U.S. 64, 72 (1969).  Richards's coercion claim is based entirely on perjured testimony, and thus, is unsupportable. See, e.g., Scher v. Nat'l Ass'n of Sec. Dealers, Inc., 386 F. Supp. 2d 402, 409 (S.D.N.Y. 2005) (finding plaintiff could not state a claim for

"supposed deprivation of her constitutional rights" where she had perjured herself before the National Association of Securities Dealers); see also United States v. Nanni, 59 F.3d 1425, 1431 (2d Cir. 1995) (negative inferences may not be drawn from immunized exculpatory testimony "except to the extent that the testimony amounts to perjury").

Richards is attempting to turn the "dilemma" faced by individuals who are improperly coerced into incriminating themselves or who risk a negative inference from their silence, into a "trilemma" whereby an individual feels he must either testify truthfully, risk the inference, or lie under oath. See Brogan, 522 U.S. at 404. The Supreme Court rejected this "trilemma," which is "wholly of the guilty suspect's own making," as insufficient to implicate the Fifth Amendment's protection. Id. The government may have been provided "the leverage to secure [Richards's] guilty plea" by Richards's lies, see Richards Reply Br. 25, but Richards's attempt to draw a sort of constitutional equivalency between a "coerced confession" and a coerced lie, see Richards Reply Br. 13 (quoting Higazy v. Templeton, 505 F.3d 161, 171 (2d Cir. 2007)), is exactly the type of "compassion inflation" that the Supreme Court has declared outside the purview of the Fifth Amendment, Brogan, 522 U.S. at 404. Thus, it was not "ironic" that the government used Richards's false statements in its obstruction charge against

him, see Richards Reply Br. 25, but simply a predictable consequence of his mendacity.

Richards argues that the rule denying constitutional protection to coerced false testimony does not apply to this case because the government acted "covert[ly]" in securing his testimony, by "compell[ing] [him] to speak without disclosing . . . its role in his dilemma to speak or be fired." Richards Letter at 1. But even assuming that the government engaged in such "covert acts" by not revealing its role in CA's investigation, see id. – a curious claim given that Richards was interviewed at the United States Attorney's Office, and now concedes on appeal that he knew at his interview that he was a target of a securities fraud investigation – Richards cites no case law supporting his argument, nor can he because, as he concedes, even "[o]utside the immunity context, courts often have repeated that the Fifth Amendment grants no right to lie," id. at 2.

While circumstances may provide a duress defense due to improper government pressure, see, e.g., United States v. Knox, 396 U.S. 77, 82-83 (1969), nothing about the circumstances under which Richards was interviewed rendered his false statements immune or otherwise afforded him Fifth Amendment protection, see United States v. Jacobs, 547 F.2d 772, 777 (2d Cir. 1976) ("[A] constitutional claim may not be asserted as a defense to a perjury charge."). Thus, Richards's indictment was neither

jurisdictionally deficient nor "motivated by a coerced confession," McMann, 409 F.2d at 1023, and his coercion claim is therefore barred by his guilty plea, see Hayle v. United States, 815 F.2d 879, 881 (2d Cir. 1987).

**III. Do The Defendants' Sentences Violate The Ex Post Facto Clause?**

Next, Kumar and Richards contend that application of the 2005 Guidelines to their fraud offenses, which were completed in 2000, violated the Ex Post Facto clause. See U.S. Const. art. I, § 9, cl. 3; see also art. I, § 10, cl. 1 (prohibiting states from passing any ex post facto law). We believe this claim is without merit.

A "sentencing court must generally apply the version of the Guidelines that is in effect at the time of sentencing, unless there is an ex post facto problem" with such application. United States v. Rodriquez, 989 F.2d 583, 587 (2d Cir. 1993) (internal citation omitted); see also U.S.S.G. § 1B1.11(a) (2008) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). For a law to contravene the Ex Post Facto clause, "two critical elements must be present: First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it." Miller v. Florida, 482 U.S. 423, 430 (1987) (internal quotation marks omitted); see United States v. Kilkenny, 493 F.3d 122, 126 (2d Cir. 2007)

-22-

("[T]he Ex Post Facto Clause enshrines in the Constitution a basic presumption of our law, that is, legislation in the criminal law is not to be applied retroactively." (internal quotation marks omitted)).

The defendants contend that application of the 2005 Guidelines to their fraud offenses was both "disadvantage[ous]" and "retrospective." Miller, 482 U.S. at 430. They argue that their fraud offenses were "completed . . . in October 2000, when the New Business Model brought an end to the 35-day month practice," Kumar Br. 16, and therefore, that application of the 2005 Guidelines to their securities fraud offenses, which substantially increased their sentences, violated the Ex Post Facto clause. The government responds by citing the "one-book rule," in effect prior to the time of the defendants' commission of fraud, which provides that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." See U.S.S.G. § 1B1.11(b)(3).

Here, there is no question that application of the 2005 Guidelines disadvantaged the defendants by subjecting them to the higher ranges of the 2005 Guidelines compared to the 1998 version of the Guidelines in effect when the 35-day month practice was

discontinued in October 2000.[10]  Both Kumar and Richards were convicted of fraud and obstruction.  In accordance with U.S.S.G. § 3D1.2(c), these crimes were grouped together for sentencing under the higher of the two applicable offense levels, which groups the separate offenses of fraud and obstruction into a single group because "one of the counts," here, obstruction, "embodies conduct that is treated as a[n] . . . adjustment to the guideline applicable to [the other] count[]," here, fraud.  See U.S.S.G. § 3C1.1.  The effect of the aforementioned revisions to the 1998 Guidelines, see supra n.9, resulted in a 20-level enhancement for both Kumar and Richards, from offense levels of 30, calling for a range of 97 to 121 months' imprisonment, to offense levels of 50, calling for life imprisonment.[11]  The

_____

[10]    The relevant changes to the Guidelines occurred in 2001, 2002 and 2003.  In November 2001, the Sentencing Commission (the "Commission") revised the fraud guidelines to provide for "an increase based upon the 'loss'" for most loss amounts.  Kumar Br. 17 (quoting Thomas W. Hutchinson, Highlights of the 2001 Amendments, Federal Sentencing Guidelines Manual, 2001 edition, XII (West 2001 ed.)) (internal quotation marks omitted).  In January of 2003, in response to the Sarbanes-Oxley Act, the Commission further expanded the loss table by adding two new categories – more than $200 million and more than $400 million – with the latter calling for a 30-level enhancement in sentence under the Guidelines.  See U.S.S.G. § 2B1.1(b)(1) (Supp. 2002).  In January of 2003, the Commission also created enhancements for the number of victims, so that a six-level increase is now required for frauds involving 250 or more victims.  See id. § 2B1.1(b)(2).  At the same time, the Commission added a new four-level enhancement if the offense involved a violation of the securities laws and the defendant was an officer or director of a publicly traded company.  See id. § 2B1.1(b)(13).

[11]    Regardless of whether the 1998 or the 2005 Guidelines are applied to the defendants' fraud offense, the grouping rules

-24-

differences between the application of the 1998 and the 2005 version of the Guidelines is decidedly detrimental to the defendants.  Thus, our only inquiry is whether application of the 2005 Guidelines to the defendants' sentences was "retrospective" within the meaning of the Ex Post Facto clause.  See Miller, 482 U.S. at 430.[12]

We previously reserved ruling on this question.  See United States v. Santopietro, 166 F.3d 88, 96-97 (2d Cir. 1999), abrogated on other grounds, Sabri v. United States, 541 U.S. 600 (2004).  In Santopietro, we noted that "[t]he Commission has

would require the sentencing court to impose "the highest offense level of the counts in the Group."  U.S.S.G. § 3D1.3(a).  As the defendants recognize, the offense level attributed to the defendants' fraud counts would be higher than that attributed to the obstruction count irrespective of the Guidelines version applied.  Therefore, the government's assertion that the sentences do not violate the Ex Post Facto clause "because the[] counts were properly grouped pursuant to § 3D1.2" is misplaced.  If the sentences do not offend the Ex Post Facto clause, it is only because the application of the one-book rule is not retrospective.  See U.S.S.G. § 1B1.11 cmt. background (1998) ("Moreover, the approach set forth in subsection (b)(3) should be followed regardless of whether the offenses of conviction are the type in which the conduct is grouped under § 3D1.2(d)."); U.S.S.G. § 1B1.11 cmt. background (2005).

[12]  The district court found that the one-book rule did not raise an ex post facto issue in this case, based on its conclusion that, after United States v. Booker, 543 U.S. 220 (2005), the Ex Post Facto clause does not apply to the previously mandatory, now advisory, Guidelines.  The government has disclaimed reliance on the district court's analysis in its opening brief, see Gov't Br. 45 n.15; see also Kumar Reply Br. 1-2 (noting that the government abandoned the argument it had advanced to the district court that the Ex Post Facto clause does not apply to sentences post-Booker), and we therefore proceed with consideration of this appeal on the assumption that the Ex Post Facto clause applies to the advisory Guidelines.

-25-

issued a policy statement specifying that where some offenses occur before and some occur after a revised Guidelines version, the later version is to be applied to all offenses."  Id. at 96; accord U.S.S.G. § 1B1.11(b)(3) (1998).  However, the Commission's policy statement does not mark the end of the inquiry, because "an agency's interpretation of its own regulations" is only given "controlling weight" where its interpretation "does not violate the Constitution or a federal statute."  Stinson v. United States, 508 U.S. 36, 45 (1993) (internal quotation marks omitted); accord United States v. Stephens, 347 F.3d 427, 430 (2d Cir. 2003).  Thus, we must independently consider whether the one-book rule violates the Ex Post Facto clause.

A majority of circuit courts has held that the one-book rule does not contravene the Ex Post Facto clause, "at least as applied . . . to a series of similar offenses."  Santopietro, 166 F.3d at 96.  In United States v. Vivit, the Seventh Circuit held that "the enactment of the grouping rules [under U.S.S.G. § 3D1.2] provides fair notice such that the application of § 1B1.11(b)(3) and 3D1.2 does not violate the Ex Post Facto Clause."  214 F.3d 908, 919 (7th Cir. 2000).  According to the Seventh Circuit, the combination of the grouping rules and the one-book rule puts a defendant on notice that "the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group."

*Id.* at 918 (internal quotation marks omitted).  The Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits agree.  *See* United States v. Bailey, 123 F.3d 1381, 1404-05 (11th Cir. 1997) ("[T]he one book rule, together with the Guidelines grouping rules and relevant conduct, provide that related offenses committed in a series will be sentenced together under the . . . Manual in effect at the end of the series.") (footnotes omitted); *see also* United States v. Sullivan, 255 F.3d 1256, 1262-63 (10th Cir. 2001); United States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000); United States v. Kimler, 167 F.3d 889, 893-95 (5th Cir. 1999); United States v. Cooper, 35 F.3d 1248, 1254-55 (8th Cir. 1994), *vacated*, 514 U.S. 1094 (1995), *reinstated*, 63 F.3d 761, 762 (8th Cir. 1995) (per curiam), *cert.* denied, 517 U.S. 1158 (1996).[13]

The Third and Ninth circuits, however, have rejected the Commission's position as incompatible with the Ex Post Facto clause.  In United States v. Ortland, the defendant was charged with five identical counts of mail fraud.  109 F.3d 539, 547 (9th Cir. 1997).  The offenses charged in four of the counts occurred prior to November 1, 1989, when the relevant Guidelines section

---

[13]    In its recent opinion in United States v. Anderson, 570 F.3d 1025, 1033-34 (8th Cir. 2009), the Eighth Circuit applied the one-book rule to overcome an ex post facto challenge in the case of a defendant's convictions for wire fraud and failure to appear for trial.  Although the crimes at issue were potentially subject to grouping under Guidelines section 2J1.6 and 3D1.2(c), Anderson's ex post facto analysis makes no mention of the Guidelines' grouping rules and bases its holding entirely on the application of the one-book rule.  *Id.*

-27-

for calculating loss in a fraud case was amended, and the fifth count covered conduct that took place in December 1989, after the amendment. Id. at 546. The district court, finding no ex post facto problem, applied the amended Guidelines section to all five counts resulting in an enhanced sentence for the first four counts. Id.

The Ninth Circuit viewed each count as a "completed" offense, and concluded that "[a]pplication of the [Commission's] policy statement in this case would violate the Constitution; its application would cause Ortland's sentence on earlier, completed counts to be increased by a later Guideline." Id. at 547. The Ortland court further questioned the "logic[]" behind the one-book rule, opining that

> [t]he harm caused by the earlier offenses can be counted in sentencing the later one. That does not mean that the punishment for the earlier offenses themselves can be increased, simply because the punishment for the later one can be. In fact, were the later count to fall at some time after sentencing, all that would remain would be the earlier sentences, which would be too long. There are, in fact, five separate crimes; each carries its own punishment, even if the sentences are all run concurrently to the extent that they overlap.

Id. (emphasis in original) (internal citation omitted). The Ortland court effectively found that application of the one-book rule under the circumstances would be akin to the "tail wagging the dog." See, e.g., United States v. Bertoli, 40 F.3d 1384, 1404 n.17 (3d Cir. 1994) (concluding that, "while the one-book

-28-

rule . . . certainly can compel application of the earlier Manual," the Ex Post Facto clause may apply so as to prohibit the application of the later Manual to all counts); see also Santopietro, 166 F.3d at 96 (discussing the related problem, left by Ortland and Bertoli, of "whether the grouping rules of the earlier or later versions are to be applied, after each version has been used to determine the adjusted base offense level for each count").

In Santopietro we declined to reach this issue, in part because of the circuit conflict, and in part because it was possible that the defendant's sentence in that case would not be affected by the difference in the two Guidelines versions. Id. at 96-97.[14] In this case, we must face the issue because the defendants' Guidelines calculations under the later version had an unequivocally negative impact on their recommended sentences. In addition, in the decade since Santopietro was decided, courts within this circuit have repeatedly wrestled with, and are divided on, the issue. Compare United States v. Weisberg, No. 07CR66, 2008 WL 2323376, at *4-5 (W.D.N.Y. June 2, 2008) (finding no ex post facto problem where "defendant was on notice that any tax offense committed after November 2001 would face the more stringent tax table"), with United States v. Johnson, Nos. 97-CR-

---

[14]   Nor did this circuit's ruling in United States v. Meeks resolve the issue currently before us.  25 F.3d 1117 (2d Cir. 1994), abrogated by Johnson v. United States, 529 U.S. 694 (2000).  See infra note 17.

-29-

206, 98-CR-160, 1999 WL 395381, at *9-11 (N.D.N.Y. June 4, 1999) (concluding that "the most appropriate way to handle . . . multiple counts in light of the [E]x [P]ost [F]acto clause is to apply the earlier Sentencing Manual to those counts as to which the underlying conduct was completed before the later version became effective . . . and apply the current version to counts involving subsequent conduct"). Thus, this case presents the appropriate opportunity to "provide[] definitive instructions on how to handle such a situation." Johnson, 1999 WL 395381, at *10.

We conclude that the one-book rule set forth in § 1B1.11(b)(3) does not violate the Ex Post Facto clause when applied to the sentencing of offenses committed both before and after the publication of a revised version of the Guidelines. "[C]entral to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" Miller, 482 U.S. at 430 (quoting Weaver v. Graham, 450 U.S. 24, 30 (1981)). The existence of an ex post facto violation turns on whether an individual was deprived of fair notice, "not [on] an individual's right to less punishment." Weaver, 450 U.S. at 30. The Framers' intent in requiring such notice was "to assure that legislative Acts give fair warning of their effect and permit individuals to rely on

their meaning until explicitly changed." Id. at 28-29.

Applying these principles to § 1B1.11(b)(3), we hold that the adoption of the one-book rule prior to the commission of the defendants' obstruction offense had placed them on notice of the consequences of committing that second offense. That the consequences of the second offense included the application of the post-amendment Guidelines to all offenses considered at the defendants' sentencing was fully apparent prior to the commission of the crimes that triggered those consequences. When the defendants committed their obstruction offenses, "it was not the amendments to the Sentencing Guidelines that disadvantaged [the defendants], it was [their] election to continue [their] criminal activity." Cooper, 35 F.3d at 1250; accord Vivit, 214 F.3d at 919.

Our affirmance of the defendants' sentences on this ground offends neither of the fundamental concerns - notice and governmental restraint - protected by the Ex Post Facto clause. As to notice, we observe that prior to the commission of their obstruction offenses the defendants could have altered their conduct so as to avoid any heightened punishment imposed on the basis of the one-book rule by choosing not to obstruct the government's investigation of their prior fraud. As to governmental restraint, our holding continues to prevent the Sentencing Commission and Congress from imposing a heightened

-31-

punishment following the commission of the criminal conduct triggering that punishment. As the Guidelines themselves recognize, application of the one-book rule does not, and indeed may not, entail the application of a sentencing range devised after the commission of all of the offenses subject to sentencing. See § 1B1.11 cmt. background (2008) ("[E]ven in a complex case involving multiple counts that occurred under several different versions of the Guidelines Manual, it will not be necessary to compare more than two manuals to determine the applicable guideline range - the manual in effect <u>at the time the last offense of conviction was completed</u> and the manual in effect at the time of sentencing." (emphasis added)).[15]

The one-book rule, when it leads to a higher sentencing range than would be applied to a single offense, operates in a manner similar to that of the recidivist statutes and "three strikes" laws upheld by the Supreme Court and our sister circuits in the past. The Supreme Court in <u>Gryger v. Burke</u>, 334 U.S. 728 (1948), rejected the defendant's argument that the consideration

_____

[15] Contrary to Judge Sack's contention, our ruling does not suggest that legislatures may avoid the restrictions of the <u>Ex Post Facto</u> clause by including in criminal laws some notice that the law "might change." See Dissent at 24 (quoting <u>Miller</u>, 482 U.S. at 431). Kumar and Richards at the time of their obstruction offenses, were on notice that the law had changed and would apply to their convictions for fraud if, and only if, they invoked the one-book rule by committing a subsequent offense. Nor was the notice provided to the defendants "speculative and incomplete," Dissent at 25; at no point would an examination of the Sentencing Guidelines have left the defendants uncertain as to the sentencing ranges applicable to their conduct.

of his past offenses in determining his sentence for a later offense was foreclosed by the Ex Post Facto clause. Id. at 732. ("[W]e [do not] think the fact that one of the convictions that entered into the calculations by which petitioner became a fourth offender occurred before the Act was passed, makes the Act invalidly retroactive . . . ."). The Ninth Circuit has on several occasions upheld such laws. United States v. Ahumada-Avalos, 875 F.2d 681, 684 (9th Cir. 1989) (per curiam) (upholding a repeat offender statute); see also United States v. Kaluna, 192 F.3d 1188, 1199 (9th Cir. 1999) (en banc) ("The Supreme Court and this court uniformly have held that recidivist statutes do not violate the Ex Post Facto clause if they are 'on the books at the time the [present] offense was committed.'" (alteration in original) (quoting Ahumada-Avalos)). The Fifth, Seventh, Eighth, and Eleventh Circuits have come to this same conclusion. See United States v. Rosario-Delgado, 198 F.3d 1354, 1356 (11th Cir. 1999); United States v. Rasco, 123 F.3d 222, 227 (5th Cir. 1997); United States v. Washington, 109 F.3d 335, 338 (7th Cir. 1997) ("The three-strikes law was enacted before Washington committed the bank robberies, so he had fair warning of the consequences attached to new violent offenses."); United States v. Farmer, 73 F.3d 836, 841 (8th Cir. 1996).

The fact that the impetus for enacting the recidivist statutes was to reflect the greater culpability associated with

the latter offenses, whereas the impetus for the enactment of the one-book rule is to avoid "piecemeal" sentencing, U.S.S.G. § 1B1.11 cmt. background (2008), is of no relevance for purposes of determining the retroactivity of the legal consequences of a defendant's actions. It might also be argued that the recidivist statutes impose punishment upon only a single crime, the prior offenses having already been committed and for which the defendant had been sentenced. Of the seven cases cited above, however, six place no reliance on that potential distinction. Only the Eighth Circuit, in Farmer, implies that the sentencing of only the last crime that triggered the consequences of the recidivist statute was a factor supporting the constitutionality of the "three strikes" law. 73 F.3d at 841 ("[S]o long as the actual crime for which a defendant is being sentenced occurred after the effective date of the new statute, there is no ex post facto violation." (quoting United States v. Allen, 886 F.2d 143, 146 (8th Cir. 1989)) (internal quotation marks omitted)). Despite this statement in Farmer, the distinction between the recidivist statutes and the one-book rule makes neither a practical nor a logical difference for purposes of an analysis under the Ex Post Facto clause. In both cases, prior conduct becomes the basis for imposing a heightened sentence only upon conviction for a later criminal act.[16] Here, the defendants'

---

[16] Judge Sack attempts to distinguish the operation of recidivist statutes from the operation of the one-book rule by

-34-

obstruction offense is the "actual crime" triggering the application of the one-book rule, the defendants had prior notice of the consequences of that crime, and therefore the application of the one-book rule is proper.[17]

noting that recidivist statutes "impose a stiffer penalty for the latest crime," but he fails to acknowledge that the stiffer penalty is imposed only because the defendant committed earlier crimes. See Dissent at 28. Judge Sack also states that Congress could rewrite the one-book rule to reflect its concern with the gravity of the subsequent triggering offense and thereby satisfy his reading of the Ex Post Facto clause. Dissent at 28-29. As we previously noted, the motivation for enacting the one-book rule, whether to avoid disjointed sentences or to reflect a crime's severity, is irrelevant to an ex post facto analysis of retroactivity. Contra Dissent at 26 ("[T]here is a crucial difference between the legislative branch deciding that a particular crime is more serious when committed by . . . a person who has a specified level of past criminal behavior than someone who does not, and increasing a penalty for a completed crime 'triggered' by the commission of a subsequent one."). That a revised one-book rule could satisfy Judge Sack's standard while accomplishing precisely the same results, with only a superficial change to the rule's current language, underscores the dissent's essential formalism.

[17] Judge Sack's dissent relies in part on United States v. Meeks, 25 F.3d 1117 (2d Cir. 1994), abrogated by Johnson v. United States, 529 U.S. 694 (2000), in which this circuit found a violation of the Ex Post Facto clause where Congress retroactively altered a previously imposed sentence by changing the consequences of a defendant's violation of the terms his supervised release. In Meeks, the court reasoned that changing the terms of a previously imposed sentence without any subsequent criminal act by the defendant was an unconstitutional alteration of "the legal consequences of a defendant's completed acts." 25 F.3d at 1121. The court distinguished Congress's change to the terms of supervised release from the operation of recidivist statutes by noting that the latter "simply alter the legal consequences of future criminal conduct." Id. We find the operation of the one-book rule to be similar to the operation of recidivist statutes because both turn on the legal consequences of future criminal conduct prior to the imposition of any sentence. Meeks is silent as to the constitutionality of a law that increases a sentence as a consequence of subsequent criminal

Kumar offers a hypothetical situation that, he claims, demonstrates the incorrectness of our ruling.  Kumar Br. 25.  In his hypothetical, he posits two defendants, A and B, and that the fraud penalties are increased, as here, between 2000 and 2004 in the event of a conviction for both fraud and obstruction of justice.  Defendant A is convicted of committing fraud in 2000 and is found at a <u>Fatico</u> hearing to warrant a sentencing enhancement on the basis of obstruction of justice perpetrated in 2004, although he is not tried or convicted of that crime.  Defendant B is convicted of both fraud committed in 2000 <u>and</u> of obstructing justice in 2004.  Kumar notes that in such a situation, as a result of the one-book rule, "B's offense level [for the fraud] would be higher than A's . . . even though their conduct was the same."  Kumar Br. 25-26.  The error in Kumar's reasoning, of course, is that the hypothetical defendants face

conduct and applies only where all of the relevant crimes are tried and punished simultaneously.

Nor does our decision today run counter to the Supreme Court's dicta in <u>Johnson</u>, as Judge Sack implies.  Dissent at 14 n.8.  The "serious constitutional questions" to which <u>Johnson</u> alludes did not relate to the <u>Ex Post Facto</u> clause, but to the prospect of criminal punishment for non-criminal conduct and problems of double jeopardy.  529 U.S. at 700.  <u>Johnson</u> further states that, "since postrevocation penalties relate to the original offense, to sentence Johnson to a further term of supervised release . . . would be to apply this section retroactively."  <u>Id.</u> at 701.  This dictum, like our circuit's holding in <u>Meeks</u>, was concerned with an increase of a previously rendered sentence that was not triggered by a subsequent crime; the Court did not address the constitutionality of heightened punishment resulting as the consequence of the commission of, and conviction for, a subsequent crime.

different consequences as a result of substantially different circumstances. Defendant A could have received a higher sentence for the fraud if the prosecutor had obtained a conviction for both offenses because Defendant A would have been on notice of the legal consequences of a conviction for the obstruction, which would have triggered the one-book rule and, thus, would have included a higher sentence for fraud than would have been the case without the obstruction conviction. In this hypothetical, however, only Defendant B's conduct resulted in a conviction for obstruction. Because the prosecutor in Defendant A's case did not obtain a conviction for the obstruction, the sentence for the fraud is necessarily lower. The difference is not the result of an inequity in the guidelines; it is the result of a successful prosecution of Defendant B for obstruction, which triggered the operation of the one-book rule of which Defendant B had notice, and which was absent in the case of Defendant A. Kumar's hypothetical has no ex post facto implications.

In substance, the defendants propose a rule requiring notice before the first offense of the sentencing consequences flowing from subsequent offenses. The emptiness of the notice demanded by the defendants' position is obvious. Notice of the consequences of a subsequent offense, an offense presumably not even contemplated at the time the first offense is committed, would have no bearing on the commission of the first offense.

The one-book rule only becomes relevant to a defendant at the time of the commission of a subsequent offense, when it puts the defendant on notice that when he commits that subsequent offense the sentence for his first offense will be higher than it would have been otherwise.

In rejecting the holdings of the Third and Ninth circuits, we recognize the practical – though unlikely – risk that applying the one-book rule to offenses that straddle a Guidelines revision could result in a defendant being sentenced for offenses according to the revised Guidelines only to see the second offense, which enabled the application of the one-book rule, fall out after sentencing. See Ortland, 109 F.3d at 547. The hypothetical posed in Ortland is, of course, irrelevant on the facts of this case. Kumar and Richards were sentenced based on two proper convictions, and the application of the one-book rule to their sentencings does not offend the Constitution's Ex Post Facto clause.

**IV. Was The Loss Calculation Clearly Erroneous?**

Next, the defendants argue that the district court's determination that their fraudulent conduct resulted in financial losses greater than $400 million was clearly erroneous and, as a result, improperly enhanced their Guidelines level by thirty points. The government responds that there was ample support for the district court's calculation based on the testimony of the

government's expert at the <u>Fatico</u> hearing.  We agree with the government and affirm the district court's loss calculation.

A sentencing court is not required to compute the loss resulting from a fraud offense "with precision."  <u>United States v. Jacobs</u>, 117 F.3d 82, 95 (2d Cir. 1997).  Instead, "[t]he court need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1, cmt. n.3 (1998).  Moreover, because the district court occupies a unique position to assess the evidence and estimate the loss based upon that evidence, the court's loss determination is entitled to appropriate deference.  <u>See</u> <u>United States v. Bennett</u>, 252 F.3d 559, 565 (2d Cir. 2001); <u>United States v. Germosen</u>, 139 F.3d 120, 129 (2d Cir. 1998); <u>cf.</u> <u>United States v. Rostoff</u>, 53 F.3d 398, 407 (1st Cir. 1995) ("Calculating the amount of loss for purposes of the sentencing guidelines is more an art than a science.  Courts can, and frequently do, deal with rough estimates.").  While "[l]osses from causes other than the fraud must be excluded from the loss calculation," <u>United States v. Ebbers</u>, 458 F.3d 110, 128 (2d Cir. 2006), courts frequently calculate loss in securities fraud cases "by relying on the change of market capitalization as a result of the disclosure of the fraud," Gov't Br. 52, in order to prevent "perpetrators of [the] fraud" from "get[ting] a windfall," <u>Ebbers</u>, 458 F.3d at 127.

The loss calculation in this case was sharply disputed.  The

most significant area of disagreement centered on how to properly frame the economic impact of the 35-day month practice. The government's expert, Dr. Mukesh Bajaj, framed the loss resulting from the 35-day month practice as an "earnings miss," which caused an estimated 10.68% decline in CA's stock price that translated into a loss of $330 million for one quarter of fiscal year 2000 alone. Conversely, the defendants' expert, Professor Daniel Fischel, denied that the 35-day month practice caused an "earnings miss," whereby the earnings CA reported were completely "fabricate[d]," but instead testified that the practice only caused an "earnings shift," whereby earnings that were properly attributable to a future quarter were reported in the previous quarter. Kumar Br. 29-30 (internal quotation marks omitted). Fischel did not submit his own loss calculation, but focused only on refuting Bajaj's analysis.[18]

The district court held a Fatico hearing in order to untangle this web. During the hearing, the district court questioned both Bajaj and Fischel on their respective analyses. Specifically, the district court challenged Bajaj's analysis as based on only one quarter's losses, which Fischel argued resulted in an artificially inflated loss calculation. In turn, the

---

[18] Bajaj also submitted "two alternative scenarios" to the district court, calculating loss figures of "at least $3.1 billion" and "at least $3.5 billion." Supplemental Report of Dr. Mukesh Bajaj, at 22-23, Oct. 9, 2006. The district court did not rely on these alternative figures in its loss calculation.

district court questioned Fischel's analysis insofar as seeming to imply that the fraudulent conduct caused no economic loss whatsoever. Fischel conceded, however, that, even if Bajaj's "earnings miss" nomenclature was inaccurate, there was still an investor loss to be ascertained based not only on the market impact of the 35-day month practice on earnings, but also on the "real effect on cash flows resulting from th[e] disclosure" of the practice, which led to a drop in confidence in CA's management and market speculation about the extent of the fraudulent activity. See Fatico Hr'g Tr. 416:13-14, Oct. 25, 2006.

Ultimately, the district court accepted Bajaj's calculation. The court found that "[a]lthough[ the] precise dollar amount of the loss . . . is difficult if not impossible to fix, the testimony of Dr. Bajaj [was convincing] that the loss was in the hundreds of millions of dollars." Kumar Sentencing Tr. 64:17-20. In rejecting Fischel's analysis, the court noted that Fischel was unable to explain why CA executives would engage in the 35-day month practice if it did not, in fact, positively affect CA's stock price. See Kumar Sentencing Tr. 64:1 (characterizing Fischel's testimony during the Fatico hearing as "not enlightening"). Consequently, the defendants' Guidelines calculation was enhanced thirty levels (under the 2005 Guidelines) for the financial loss.

On appeal, Kumar and Richards claim that the district court's reliance on Bajaj's "earnings miss" analysis was clearly erroneous, because Fischel showed that the 35-day month practice did not result in earnings misses but instead in earnings shifts whereby any earnings lost in one quarter were made up in the subsequent one. As an initial matter, the record reveals that Fischel's objection to the term "earnings miss" was partly semantic. As the defendants now concede, Bajaj did not analyze the 35-day month practice as resulting in an earnings miss, but instead his analysis simply "removed the earnings associated with each contract from the quarter in which it had been improperly booked and 're-booked' it in the proper quarter." Kumar Br. 27. However, despite this concession, the defendants argue that Bajaj's calculation was nevertheless erroneous because he only calculated the "miss" part of the shift, and did not take into account that, had CA "reported . . . its earnings correctly, . . . it would have reported higher earnings in the third and fourth quarters of fiscal year 2000 than the earnings it actually reported." Kumar Br. 30 (emphasis in original, internal quotation marks omitted). Thus, the defendants argue that Bajaj's calculation should have accounted for these higher earnings, which would have significantly – or completely – offset the earnings miss in the prior quarters.

We are not persuaded.  Taken to its logical conclusion, the defendants' argument would also compel the conclusion that CA's investors did not suffer any loss due to the 35-day month practice, since under Fischel's hypothesis, the false gains and the false losses should have effectively canceled each other out. Fischel himself undermined this conclusion during the Fatico hearing when he conceded that the 35-day month practice "obviously" had a "real negative monetary effect" on CA's investors, not only by affecting CA's "cash flow[]," but by injecting "speculation" into the market and harming investor confidence in CA's management.  Fatico Hr'g Tr. 416:13-14, 23, 419:8, 18.  Accepting Fischel's testimony would cast doubt on the entire basis for the Generally Accepted Accounting Principles rule that earnings earned in one quarter must be reported in the same quarter; if merely "shifting" earnings between quarters had no negative effect on investors, there would be no need for the rule in the first place.  As Bajaj noted in his report, "[m]any firms that missed earnings in a given quarter could also have avoided announcing the miss if they could 'borrow' sufficient earnings from the next quarter to cover their shortfall." Supplemental Report of Dr. Mukesh Bajaj, at 12, Oct. 9, 2006. Thus, the government properly characterizes Fischel's analysis as "stretch[ing] credulity."  Gov't Br. 53.

In addition, during the Fatico hearing, the government not only provided reasons why Fischel's analysis was wrong, but also provided reasons why Bajaj's analysis was sound. Specifically, the government showed that "re-booked" false earnings in one quarter could indeed have caused CA's stock price to decline, by, inter alia, causing loss to investors who purchased CA stock at inflated prices because of fraudulent disclosures and omissions flowing from the 35-day month, then sold after such inflation had seeped out of the stock, as well as losses to investors who sold at deflated prices, where the 35-day month caused CA to understate results. See Fatico Hr'g Tr. 234-236, Oct. 25, 2006. In other words, individual sales and purchases of CA stock were singular events – thus, even assuming CA came out even in the end (a dubious contention, at best), CA's individual investors did not go unharmed. Instead, claims filed by individual investors with CA's claims administrator for their losses resulting from the 35-day month practice reveal that those losses not only existed, but were significantly underestimated by Bajaj, who "calculated damages only to an artificially narrow subset of victims: namely, those victims who filled out and submitted claims for restitution," which is often "substantially fewer than all eligible victims." Gov't Br. 55 n.22. This potential disconnect between the financial health of a corporation and that of individual investors is precisely why the type of "event

-44-

study" undertaken by Bajaj "conforms to the most widely accepted practices of economists." Id. at 55.

The defendants also claim that Bajaj's loss calculation was erroneous because the "sample of earnings misses" he used in his study "involved firms that had experienced genuine adverse developments . . . such that a stock price decline would be expected." Kumar Br. 30. Thus, the defendants argue that the sample firms Bajaj used in his study were not appropriate comparators to CA. Again, the defendants' argument is unpersuasive. In estimating a loss calculation, a sentencing court should not analyze the impact of fraud in a vacuum, but instead should recognize that "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud," not all of which will be attributable to fraudulent activity. United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007).

In this case, the district court properly focused on loss attributable to the defendants' fraud. As previously established, the 35-day month practice did indeed cause a "genuine adverse development" to CA's financial health. Moreover, Bajaj's study took other causes for CA's stock decline into account by comparing the earnings misses of CA to those of thirty other similarly-situated companies, and "perform[ing] a comprehensive regression analysis in an effort to isolate the

event-specific impact of the given firm's earnings-miss disclosure on its stock price, while controlling for market-wide or industry-wide factors." Gov't Br. 56. The district court was fully entitled to credit Bajaj's assessment of the impact of external causes on CA's stock and reject Fischel's, particularly in light of Fischel's inherently contradictory analysis.

Finally, in reviewing the district court's loss calculation, we find it particularly telling that CA's stock closed $5.85 below what would have been expected on October 10, 2003, two days after CA's public disclosure of the 35-day month practice. Multiplying that undisputed figure by the 200.2 million affected shares would have brought the estimated loss to investors to more than $1 billion, alone. Even assuming that the losses of October 9 and 10, 2003 were tied, not to the actual operation of the fraudulent 35-day month practice, but to the "possibility of an open-ended criminal and regulatory investigation that could . . . [have] disastrous effects for the company," Kumar Br. 37 (alteration in the original), financial loss caused by speculation that stems from the fraudulent practice and a loss of confidence in management is properly included in the loss calculation, see Ebbers, 458 F.3d at 127. Thus, we affirm the district court's loss calculation of greater than $400 million as not clearly erroneous.

**V. Were The Defendants Properly Denied Acceptance Of Responsibility Credit?**

-46-

Next, the defendants argue that, "[a]lthough [they] pleaded guilty to all the charges against [them]," the district court abused its discretion in denying them "<u>any</u> credit for acceptance of responsibility." Kumar Br. 44 (emphasis in original); <u>see</u> Richards Br. 47-48.

A defendant is entitled to a two-point reduction under U.S.S.G. § 3E1.1(a) if he "clearly demonstrates acceptance of responsibility for his offense." A defendant "who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1, cmt. n.3. In particular, a defendant who engages in "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily" would not be entitled to the reduction, as such conduct "indicates that the defendant has not accepted responsibility for his criminal conduct." <u>Id.</u> at cmt. n.4. However, there may be "extraordinary cases" in which a defendant who obstructs justice in some way is also entitled to a reduction for acceptance of responsibility. <u>Id.</u>

A district court's § 3E1.1 determination is entitled to "great deference" because the "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." <u>Id.</u> at cmt. n.5. A district court's decision to deny credit for acceptance of responsibility, primarily a factual determination,

will be upheld unless it is "without foundation."  United States v. Harris, 13 F.3d 555, 557 (2d Cir. 1994).

### A.    Kumar's Acceptance Of Responsibility

At sentencing, the district court denied Kumar's request for an acceptance of responsibility reduction under § 3E1.1, concluding that Kumar had not sufficiently accepted responsibility for his criminal conduct because he had obstructed justice, and because he had waited until the eve of trial to plead guilty.  In addition, the district court noted that (1) Kumar's plea allocation was phrased to "mute[] the gravity of his complicity in the securities fraud offenses," Sentencing Tr. 61:12-13, Nov. 2, 2006, and (2) Kumar's meritless objections to the evidence-tampering and fraudulent transaction allegations in the PSR revealed a lack of acceptance of responsibility, Kumar Sentencing Tr. at 60:18-61:21.

On appeal, Kumar claims that the district court's rejection of his acceptance of responsibility request was erroneous.  First, Kumar claims that, although an acceptance of responsibility departure is generally unavailable when a defendant engages in obstructive behavior, that exception does not apply to him because his obstructive behavior occurred pre-indictment and the exception only applies to post-indictment obstructive behavior.  See, e.g., United States v. Gregory, 315 F.3d 637, 641 (6th Cir. 2003) (granting acceptance points where

"[a]ll of [the defendant's] obstructive conduct predated [the] indictment"); see also United States v. Teyer, 322 F. Supp. 2d 359, 368 (S.D.N.Y. 2004) ("Were courts to hold that any obstructive conduct, however early in the investigation . . . of a case . . . forever disentitled a defendant to credit for later acceptance of responsibility, this incentive would be ill served."). Second, Kumar argues that the district court placed too much reliance on the "lateness" of his plea in rejecting his request for an acceptance of responsibility reduction, which he argues is only a basis for denying him "a third acceptance point, . . . but [not] . . . for denying the first two." Kumar Br. 44; see United States v. Sloley, 464 F.3d 355, 359 (2d Cir. 2006) ("[A] government motion is a necessary prerequisite to the additional one-level decrease [for a timely plea] under Guidelines § 3E1.1(b)."); see also Kumar Br. 49 (noting that "this Court has not directly addressed the relationship between the timeliness of a defendant's guilty plea and his receipt of acceptance credit").

We need not resolve either of these alleged flaws in the district court's reasoning with respect to Kumar, however, because an examination of the record shows that he engaged in sufficient objectionable post-indictment conduct to justify a rejection of his request for acceptance of responsibility credit. Specifically, Kumar, individually and separately from Richards,

acted in ways that the district court reasonably found to be inconsistent with a full acceptance of responsibility. For example, the district court found that "Kumar's carefully worded plea allocution . . . muted the gravity of his complicity in the securities fraud offenses. . . . When asked if he thought that [his fraudulent conduct] . . . would have affected a prudent investor's decision to buy or sell his company's stock, his response was: 'I could see the possibility where it could.'" Kumar Sentencing Tr. 61:11-13, 17-21. Moreover, the district court found it particularly telling that Kumar objected to the PSR on various grounds related to evidence tampering and fraudulent transactions during his tenure at CA, but then withdrew those objections during the course of the Fatico hearing, implicitly acknowledging that his objections lacked merit. Indeed, notwithstanding Kumar's withdrawal of his objection, the district court expressly found at sentencing that there was "clear[] and convincing[]" evidence that at least one of Kumar's objections was meritless. Kumar Sentencing Tr. 61:9. See U.S.S.G. § 3E1.1, cmt. n.1(a) ("[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.").

Thus, Kumar's post-indictment conduct provided a reasonable basis for rejecting his request for an acceptance of responsibility reduction.

**B.      Richards's Acceptance Of Responsibility**

While the district court set forth several reasons why Kumar did not deserve a sentencing reduction for acceptance of responsibility, in denying Richards's same request, the court relied on a single factor:  the lateness of Richards's plea. According to the district court, "the most significant factor in the acceptance of responsibility scale is the factor of time limits."  Richards Sentencing Tr. 15:7-9.  The district court concluded that, by pleading two weeks before trial, Richards had exceeded those "time limits," and therefore, was not entitled to acceptance of responsibility credit.  On this point, we disagree.

Timeliness of a defendant's plea is an appropriate consideration in the acceptance of responsibility determination. U.S.S.G. § 3E1.1 cmt. n.1(h).  However, while the two-level reduction provided for in § 3E1.1(a) is for demonstration of acceptance of responsibility, the Sentencing Guidelines specifically provide that timeliness of a plea is primarily relevant to the reduction of an additional point under § 3E1.1(b), ostensibly "for helping the authorities save resources."  United States v. Ortiz-Torres, 449 F.3d 61, 76 (1st Cir. 2006) (internal quotation marks omitted).  See United States

-51-

v. Eyler, 67 F.3d 1386, 1390-91 (9th Cir. 1995) ("While the key inquiry for purposes of [§ 3E1.1(a)] is whether the defendant has demonstrated contrition, once this has been determined, then the focus of the section (b) inquiry is on timeliness." (emphasis in original)). As Judge Lynch stated in Teyer:

> The Guidelines specifically provide a sanction for belated guilty pleas that fail adequately to save the resources of the Government and the Court. Defendants who plead at an early stage qualify for an additional one-level reduction that is correspondingly unavailable for belated pleas. That a defendant can earn an additional one-level reduction merely by notifying the authorities of his intention to plead early enough to permit the government to avoid preparing for trial strongly implies that defendants may qualify for the basic two-level adjustment for acceptance of responsibility without doing so.

322 F. Supp. 2d at 376 (alteration, internal citations, and quotation marks omitted).

Here, the lateness of Richards's plea on its own was not a sufficient foundation for denying him any acceptance of responsibility credit. While under certain circumstances the lateness of a plea might indeed weigh against the defendant, those circumstances are not present in this case. For example, Richards's plea came neither "after the [g]overnment . . . concluded presenting its case, . . . during the jury's deliberations," nor "on the morning of trial," and the district court cited no "other [relevant] factors" that warranted a rejection of Richards's request. Id. It is undisputed that Richards's obstruction and culpability was "of a different order"

-52-

than that of Kumar. Richards Sentencing Tr. 25:15-16. Unlike Kumar, Richards appeared to fully accept responsibility both prior to and during sentencing. See Richards Sentencing Tr. 12:14-16 ("Your Honor, I fully accept responsibility for the actions that I have taken and regret those actions."). Also unlike Kumar, who tampered with physical evidence, bribed witnesses, and lied repeatedly during the course of a federal investigation, Richards's obstructive conduct consisted entirely of a single, albeit false, denial of knowledge of the 35-day month practice during an interview and subsequent testimony that predated his guilty plea by three years and was accounted for in the indictment. Indeed, denying Richards acceptance of responsibility solely due to his charged obstructive conduct would effectively raise the Guidelines level for such conduct by foreclosing the opportunity for acceptance of responsibility credit in obstruction cases.

Because "the paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits the conduct comprising the offense or offenses of conviction," and because Richards did so here "in a sufficiently timely manner so as to avoid a lengthy trial and avert the risk of an irrational verdict," Teyer, 322 F. Supp. 2d at 376, his lateness in pleading guilty did not by itself provide a sufficient basis for the denial of more than a one-point reduction for acceptance of

responsibility. Accordingly, because the district court erroneously failed to award Richards a two-point reduction for acceptance of responsibility that he should have received, Richards's sentence is vacated and the case remanded to the district court for resentencing on this additional basis.

**VI. Was Richards's Sentence Substantively Unreasonable?**

Finally, Richards contends that his non-Guidelines sentence of seven years' imprisonment was unreasonably long, despite the PSR's recommendation of a life sentence. However, because we vacate Richards's sentence as procedurally unsound and remand the case for resentencing, there is no need to entertain his substantive reasonableness argument at this time. See Gall v. United States, 128 S. Ct. 586, 597 (2007) ("Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.") (emphasis added); accord United States v. Cavera, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).

**CONCLUSION**

For the foregoing reasons, the district court's judgment and sentence as to Kumar is AFFIRMED in all respects; the district court's judgment as to Richards is AFFIRMED, but Richards's sentence is VACATED and REMANDED to the district court for resentencing consistent with this opinion.

-54-

United States v. Kumar; Richards, No. 06-5482-cr

SACK, Circuit Judge, concurring in part and dissenting in part
----------------------------------------------------------------

I join in the majority's conclusions regarding the sufficiency of evidence for Richards's conviction of obstruction of justice, the rejection of Richards's coercion claim, the applicability of 18 U.S.C. § 1512(c) to Richards's conduct, the district court's loss calculation, and the defendants' acceptance of responsibility. I disagree, however, with the majority's conclusion that the defendants' sentencing on securities and wire fraud charges on the basis of the "one book" of the Sentencing Guidelines in effect in 2005, long after those violations had been completed, does not violate the constitutional prohibition against ex post facto laws. The defendants' commission of subsequent obstruction of justice offenses, though related to the underlying securities and wire fraud charges and committed at a time when the 2005 Guidelines would apply, does not, in my view, render those Guidelines applicable to the securities and wire fraud charges because at the time the defendants committed the securities and wire fraud offenses, they did not have "fair notice" of the severity of the penalties to which they might be subjected for them under the later, harsher Guidelines. To the extent that the majority conclude otherwise, I respectfully dissent.

Ex Post Facto Clause

The Ex Post Facto clause of Article I, Section 9, reads:  "No Bill of Attainder or ex post facto Law shall be passed."[1]  U.S. Const. Art. I, § 9, cl. 3.  Some eleven years after it was adopted as part of the original United States Constitution, Justice Samuel Chase, a President Washington appointee, observed that this "prohibition . . . necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing." Calder v. Bull, 3 U.S. 386, 390, 3 Dall. 386 (1798) (Chase, J.).  He then established as black letter Constitutional law that, inter alia, "[e]very [criminal] law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when

---

[1]  Section 10, which applies to the States as opposed to Congress, contains a similar prohibition against "pass[ing] any Bill of Attainder [or] ex post facto Law. . . ."  U.S. Const. Art. I, § 10, cl. 1.

committed," violates the Ex Post Facto clause.  Id.[2] (emphasis

omitted).[3]

---

[2]    Justice Chase's complete enumeration of prohibited ex post facto laws reads:

> 1st.  Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2nd. Every law that aggravates a crime, or makes it greater than it was, when committed.  3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

Id.  (emphasis in original).  The continued viability of the fourth category, at least with the breadth suggested by Justice Chase, is in doubt, see **Collins v. Youngblood, 497 U.S. 37,** 43 n.3 **(1990) (**"As cases subsequent to Calder make clear, this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes."), but that aspect of ex post facto law is not implicated in this appeal.


[3] The Supreme Court has consistently and repeatedly held that a law that increases the punishment of a crime after the completion of the offending act violates the Ex Post Facto clause.  See, e.g., Garner v. Jones, 529 U.S. 244, 249 (2000) ("One function of the Ex Post Facto Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission."); Collins, 497 U.S. at 43 ("Legislatures may not retroactively . . . increase the punishment for criminal acts."); Weaver v. Graham, 450 U.S. 24, 30 (1981) (finding that the Ex Post Facto clause "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred"); Calder, 3 U.S. at 397 (Paterson, J.) ("The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty; and therefore they may be classed together.").  These decisions recognize no distinction between the scope of

-3-

Nearly two hundred years later, Chief Justice Rehnquist, writing for the Court, explained:

> Early opinions of the Court portrayed [the enumeration by Justice Chase in Calder] as an exclusive definition of ex post facto laws [citing three Nineteenth Century Supreme Court decisions]. So well accepted were these principles that the Court in Beazell v. Ohio, 269 U.S. 167 (1925), was able to confidently summarize the meaning of the Clause as follows:
>
> > "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." Id., at 169-170.
>
> See also Dobbert v. Florida, 432 U.S. 282, 292 (1977).
>
> The Beazell formulation is faithful to our best knowledge of the original understanding of the Ex Post Facto Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts.

Collins v. Youngblood, 497 U.S. 37, 42-43 (1990) (holding change in State law allowing reformation of improper criminal verdicts not to violate Ex Post Facto clause) (footnotes omitted).

---

protection under the Ex Post Facto clause for laws that increase a sentence and laws that criminalize conduct after the commission of the relevant act.

As we observed in somewhat different circumstances, "the ex post facto doctrine is concerned not just with notice, but with the inherent injustice associated with retroactivity itself." Sash v. Zenk, 439 F.3d 61, 64 (2d Cir. 2006) (denial of panel rehearing); see also id. (contrasting the ex post facto doctrine and the rule of lenity, which is "more narrowly focused" on the sole issue of notice).[4] The ex post facto doctrine therefore requires not only "notice," but notice that is "fair." See, e.g., Weaver v. Graham, 450 U.S. 24, 30 (1981).

The "One-Book Rule"

Section 1B1.11 of the United States Sentencing Guidelines provides in pertinent part:

**Use of Guidelines Manual in Effect on Date of Sentencing** (Policy Statement)

---

[4] We continued:

> For this reason, the Supreme Court has associated the ex post facto doctrine with the Fifth Amendment's Takings Clause, which "prevents the Legislature . . . from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation,'" and with the "prohibitions on 'Bills of Attainder' in Art. I, §§ 9-10, [which] prohibit legislatures from singling out disfavored persons and meting out summary punishment for past conduct." Landgraf v. USI Film Prods., 511 U.S. 244, 266 (1994). Ex post facto is as much a doctrine of retroactivity as it is a doctrine of notice.

Id. at 64-65.

-5-

> (a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.
>
> (b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.
>
> (2) The Guidelines Manual in effect on a particular date shall be applied in its entirety. . . .
>
> (3) If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses.

The notion that only one set of Guidelines should be applied in imposing a single sentence, even where that sentence covers multiple crimes the commission of which straddles the effective dates of two sets of Guidelines, appears to derive from the principle that each set of Guidelines is meant to act as a "cohesive whole." United States v. Bailey, 123 F.3d 1381, 1404 (11th Cir. 1997). "'A sentencing court has no authority to pick and choose, taking one provision from an earlier version of the guidelines and another from a later version . . . . [The one-book rule] avoids twisting the guidelines, depriving them of uniformity and consistency.'" Id. (quoting United States v. Keller, 58 F.3d 884, 890 (2d Cir. 1995) (brackets and ellipsis in Bailey)).

Consistent with that principle, Application Note 2 to Section 1B1.11 provides, in relevant part, that

> the approach set forth in subsection (b)(3) should be followed regardless of whether the offenses of conviction are the type in which the conduct is grouped under § 3D1.2(d).  The ex post facto clause does not distinguish between groupable and nongroupable offenses, and unless that clause would be violated, Congress' directive to apply the sentencing guidelines in effect at the time of sentencing must be followed.

U.S.S.G. § 1B1.11 App. Note 2.

Relevant Facts

The facts relevant to the ex post facto issue before us are relatively simple and straightforward.

The defendants engaged in securities and wire fraud, and conspired to commit such fraud.  The last overt act of the conspiracy was committed in May of 2000, and the fraud itself -- the use of a so-called "35-day accounting month" -- ended no later than October 2000.  At the time the defendants committed these crimes, the November 1, 1998, edition of the Guidelines was in effect.

Between 2001 and 2003, the Guidelines were revised so as to increase the punishment for crimes of the sort that the defendants had previously committed.  The revisions resulted in an increase in the offense levels applicable to those crimes based upon the amount of money lost by the victims of the crime, and in an expansion of the loss table through the addition of new

-7-

categories for losses of $200 and $400 million, with the latter calling for a 30-level enhancement compared to the 20-level enhancement that would have applied to a $400 million loss under the 1998 version of the Guidelines. The revised Guidelines also created a new 6-level enhancement for fraud involving 250 or more victims, and a 4-level enhancement for violations of securities laws by defendants who were officers or directors of public companies. See U.S.S.G. §§ 2b1.1(b)(2)&(b)(13).

Under the Guidelines in effect at the time of the defendants' commission of the fraud and conspiracy crimes, the applicable offense level was 30, which translated into a Guidelines range of 97 to 121 months' imprisonment. As a result of the subsequent revisions, the offense level was raised to 50, resulting in a recommended sentence of life imprisonment. See Maj. Op. at **[24].**

Beginning in September 2002 and continuing until April 2004, the defendants engaged in various acts designed to cover up their previously committed conspiracy and fraud. In a 2005 superseding indictment -- the original indictment had been handed down in 2004 -- the defendants were charged with committing fraud and conspiracy to commit fraud over a period of time ending in 2000.[5] But the superseding indictment also charged Richards with

[5] The indictment purports to charge the frauds as occurring "[o]n or about and between April 1, 1998 and April 6, 2004, both dates being approximate and inclusive," but alleges no overt act

-8-

committing perjury thereafter, Kumar with making false statements to a Special Agent of the FBI thereafter, and both defendants with filing false SEC filings, obstructing justice and conspiring to obstruct justice thereafter.  Both defendants pled guilty to all of these charges in April 2006, and were sentenced on all of them in November of that year.  No relevant changes in the Guidelines were made between the time of the commission of the coverup crimes and the filing of the superseding indictment, the plea, and the sentencing.

Relying on the one-book rule, the district court sentenced the defendants on all of the charges to which they pled guilty under the 2005 Guidelines.  The court decided that no ex post facto issue was presented by the fact that this version of the Guidelines was not in effect at the time the defendants committed the fraud and conspiracy crimes; it therefore did not apply the exception set forth in subsection (b)(1) that instructs a court not to apply the Guidelines manual in effect on the date of sentencing if so doing would violate the Ex Post Facto clause. Using the 2005 Guidelines, the district court sentenced each

after May of 2000 and itself describes "The Scheme to Defraud" as occurring "[p]rior to and during CA's fiscal year 2000, which ended March 31, 2000."  On appeal, the government does not dispute that the frauds were completed before the revision of the Guidelines in 2001 and 2002 and the subsequent increases in the penalties for securities and wire fraud.  See, e.g., Appellees' Br. at 46 ("This case involves the application of a Guidelines manual to two sets of crimes, one occurring before, and one after, a revision of the Guidelines.").

-9-

defendant to what would appear to be (depending on the actual longevity of each defendant) well below his Guidelines-indicated life sentence: Kumar to 144 months' incarceration, followed by three years of supervised release; Richards to 84 months' incarceration, followed by three years of supervised release.

### The Majority Opinion

There is an inherent tension between the one-book rule and the <u>Ex Post Facto</u> clause -- between a rule prescribing the application of Guidelines that are current as of the day of sentencing with respect to crimes that were committed before those Guidelines went into effect, and a constitutional requirement that "[l]egislatures[6] not retroactively increase . . . the punishment for criminal acts." <u>Collins</u>, 497 U.S. at 43. Indeed, that tension is explicitly acknowledged in subsection (b)(1) of the one-book rule, quoted above. Judge Easterbrook once remarked on the "gymnastics performed" by the Seventh Circuit in the case there on appeal in resolving that tension in order "to show that a[n] . . . increase in [the defendant's] offense level [was] compatible with the <u>ex post facto</u> clause . . . ." <u>United States v. Vivit</u>, 214 F.3d 908, 924 (7th Cir. 2000) (Easterbrook, <u>J.</u>, concurring); <u>see also</u> <u>id.</u> (opining that such gymnastics were "unnecessary, because the

_____

[6] We all assume for present purposes that the Guidelines were promulgated by a "legislature." <u>Cf.</u> footnote 7, <u>infra</u>.

-10-

sentencing guidelines are not 'laws' within the scope of [the Ex Post Facto] clause").  That might be said of similar attempts by federal courts nationwide since the Guidelines regime began.  I fear, though, that in the case at bar, the majority have turned from gymnastics to contortions.

The majority and I begin on common ground.  We first assume that the ex post facto doctrine applies to the Sentencing Guidelines after the Supreme Court decided, in United States v. Booker, 543 U.S. 220, 244-268 (2005), that the Guidelines are advisory.[7]  We then agree that "[f]or a law to contravene the Ex Post Facto clause, 'two critical elements must be present: First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it.'"  Maj. Op. at 22 (quoting Miller v. Florida, 482 U.S. 423, 430 (1987)).  We also

_____

[7] We have not yet explicitly decided whether the now-advisory Guidelines can implicate the Ex Post Facto clause, although we implicitly assumed this to be the case in United States v. Kilkenny, 493 F.3d 122 (2d Cir. 2007) where, post-Booker, we analyzed the application of revised Sentencing Guidelines in light of the Ex Post Facto.  It is the subject of some disagreement among the various circuit courts.  Compare, e.g., United States v. Demaree, 459 F.3d 791 (7th Cir. 2007) (Clause not directly applicable after Booker) with, e.g., United States v. Turner, 548 F.3d 1094, 1100 (D.C. Cir. 2008) ("It is enough . . . [for purposes of the Ex Post Facto clause] that using the [post-crime] Guidelines created a substantial risk that [the defendant's] sentence was more severe" than it would have been under the Guidelines in effect at the time of the crime.); and cf. United States v. Thompson, 518 F.3d 832, 870 (10th Cir. 2008) (assuming that the Guidelines may still implicate ex post facto concerns after Booker).

-11-

agree that the second element is present here: "[T]here is no question that application of the 2005 Guidelines disadvantaged the defendants by subjecting them to the higher ranges of the 2005 Guidelines compared to the 1998 version of the Guidelines in effect when the 35-day month practice was discontinued in October 2000." Maj. Op. at 23 (footnote omitted). The use of the 2005 Guidelines raised the recommended Guidelines range from 97 to 121 months' incarceration to life imprisonment.

Where I depart from the majority's view is on the question of retroactivity. The majority recognize that

> "central to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" Miller, 482 U.S. at 430 (quoting Weaver v. Graham, 450 U.S. 24, 30 (1981)). The existence of an ex post facto violation [thus] turns on whether an individual was deprived of fair notice . . . .

Id. at 30. They find sufficient notice to the defendants by concluding that

> the adoption of the one-book rule prior to the commission of the defendants' obstruction offense had placed them on notice of the consequences of committing that second offense. That the consequences of the second offense included the application of the post-amendment Guidelines to all offenses considered at the defendants sentencing was fully apparent prior to the commission of the crimes that triggered those consequences.

Id. at 31 (emphasis added).

-12-

But it seems to me that the notice that the defendants received here was notice as to punishment for the wrong crime: not as to the fraud and conspiracy crimes for which punishment was revised markedly upward, but the subsequent obstruction offenses for which the Guidelines have not changed. This notice was inconsequential because the defendants were not subjected to an increased sentence for obstruction; they were subjected to an increased sentence for already completed frauds. And I think that the majority give insufficient attention to the quality of notice that ex post facto jurisprudence requires. It is not notice simpliciter, but notice that is "fair." As the Supreme Court said in Miller, "The constitutional prohibition against ex post facto laws cannot be avoided merely by adding to a law notice that it might be changed;" in that case the Court found an ex post facto violation because the defendant was not aware of the prescribed range of punishment for his offense at the time he committed it. Miller 482 U.S. at 431. "Ex post facto is as much a doctrine of retroactivity as it is a doctrine of notice," Sash, 439 F.3d at 64-65, and "the inherent injustice associated with retroactivity itself" must guide our analysis, id. at 64.

What we said in the related context of the change of rules regarding supervised release bears repeating here:

> We are unpersuaded by the government's argument that the Ex Post Facto Clause is not implicated so long as the penalty for a supervised-release violation is enhanced

-13-

before the defendant engages in his supervised-release-violative conduct because the violator then has notice and fair warning that that conduct will result in the enhanced penalty.  While it is true that a defendant would have notice of that enhancement before he committed his violation of supervised release, it is equally true that he would have had no such notice before he committed the original offense.  Indeed, the enhanced punishment of supervised-release revocation simply would not be applicable to him had he not committed his original offense and been sentenced, for that offense, to supervised release.  Thus, the government's notice argument is not helpful to resolving the issue presented by this appeal.

United States v. Meeks, 25 F.3d 1117, 1122 (2d Cir. 1994), abrogated on other grounds by Johnson v. United States, 529 U.S. 694 (2000).[8]  While it may be true that, in the case at hand, the

---

[8]  Although Meeks was subsequently abrogated by Johnson, it was not because the Supreme Court thought our logic on the present score unpersuasive.  To the contrary, there are repeated suggestions in the dicta in Johnson that had the issue been properly presented to the Court, it would have ruled the same way this Court did in Meeks.  But the government in Johnson specifically "disavow[ed]" the argument that it had made to, and had been endorsed by, the district court in Meeks, and that is made by the majority here: that there is no ex post facto violation because "revocation of supervised release imposes punishment for defendants' new offenses for violating the conditions of their supervised release."  Johnson, 529 U.S. at 699-700 (internal quotation marks omitted).  The Johnson Court called such a disavowment "wise[] in view of the serious constitutional question that would be raised by construing revocation and reimprisonment as punishment for the violation of the conditions of supervised release."  Id. at 700.  The Court then expressly noted that "[s]ince postrevocation penalties relate to the original offense, to sentence Johnson to a further term of supervised release under § 3583(h) would be to apply this section retroactively."  Id. at 701.  It would therefore appear that so long as the punishment for an act taken subsequently to a new law that increases the penalty for an offense relates to the punishment for an earlier offense, and not to the new act, the

-14-

one-book rule provided Richards and Kumar constructive notice of the enhancement in sentencing before they obstructed justice, "it is equally true that [they] would have had no such notice before [they] committed the original offense[s]" of fraud and conspiracy.  Id.; see also, United States v. Zagari, 111 F.3d 307, 323-24 (2d Cir. 1997) (finding, where the government sought to apply a revised version of the Guidelines to a fraud committed before the revision based upon charged but later dismissed conduct that the government alleged to amount to a continuation of the fraud after the revision, that use of the revised Guidelines violated the Ex Post Facto clause where the alleged frauds before and after the revision were "not properly subsumed into one huge scheme to defraud, . . . but rather should be thought of as separate schemes . . . .").

Six of our sister circuits that have addressed this issue have limited their conclusion of constitutionality either to cases that involve a continuing course of conduct or to cases in which the offenses are sufficiently similar to be subject to "grouping" under the Guidelines.  See United States v. Duane, 533

law is being applied retroactively and creates ex post facto concerns.  See also id. at 699 (recognizing that an ex post facto violation arises where a law "raises the penalty from whatever the law provided when [the defendant] acted") (emphasis added).  These statements were dicta because the Court concluded that section 3583(h) was not retroactive, and was therefore inapplicable to cases where the original offenses was committed before passage of the law.  Id. at 702-03.

F.3d 441, 449 (6th Cir. 2008) (concluding the "better argument in favor of § 1B1.11(b)(3)'s constitutionality" to be "that a Guidelines revision, § 1B1.11(b)(3) itself, and the § 3D1.2(d) grouping rules provide a criminal fair warning that committing future similar crimes may subject him to increased penalties for similar prior offenses"); United States v. Sullivan, 255 F.3d 1256, 1262-63 (10th Cir. 2001) ("[T]he grouping rules and the relevant conduct provisions gave [the defendant] notice that his three consecutive failures to file would be considered part of the same course of conduct and would collectively determine his sentence."); Vivit, 214 F.3d at 919 (deciding that the Guidelines, including in particular the grouping rules, succeed in "provid[ing] notice to criminals that engaging in ongoing fraudulent behavior involving the same type of harm risks grouping of convictions, which because of the one-book rule, will all be sentenced according to the Guidelines in effect when the latest conduct occurred."); United States v. Kimler, 167 F.3d 889, 895 (5th Cir. 1999) ("[The defendant] had proper notice that, if he continued to commit related offenses that would be grouped under § 3D1.2(d), he would be sentenced under the guidelines in use when he committed the last offense in the grouped series."); Bailey, 123 F.3d at 1404-05 ("[T]he one book rule, together with the Guidelines grouping rules and relevant conduct, provide that related offenses committed in a series will

-16-

be sentenced together under the Sentencing Guidelines Manual in effect at the end of the series.  Thus, a defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual."); United States v. Regan, 989 F.2d 44, 48 (1st Cir. 1993) (deciding, before the establishment of the one-book rule, that it was not an ex post facto violation to use revised Guidelines where offenses committed prior to revision had been grouped with offenses committed after the revision and "were manifestly part of the same ongoing scheme of embezzlements").

Two other circuits have found the one-book rule to be constitutional even in cases not involving continuing courses of conduct or grouped offenses.  These circuits only reached a conclusion of constitutionality, however, in cases that involved repeated commission of the same offense before and after the revision of the Guidelines.   See United States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000) (finding the application of the one-book rule to be constitutional in a case involving multiple acts of tax evasion before and after a revision of the Guidelines); United States v. Cooper, 35 F.3d 1248, 1251 (8th Cir. 1995) (concluding that the Ex Post Facto clause was not violated where "a series of firearms offenses" straddled a revision of the Guidelines, and comparing series of offenses to a

"conspiracy that straddles the Sentencing Guidelines' effective date").

The two remaining circuits that have addressed this issue[9] have unequivocally concluded, to the contrary, that the one-book rule is unconstitutional in these circumstances, even where the convictions that straddle a revision of the Guidelines are grouped for sentencing purposes. See United States v. Ortland, 109 F.3d 539 (9th Cir. 1997); United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994).

So, it seems, we now stand alone:  The panel concludes that any offense that has been committed by a defendant after a revision of the Guidelines may be used as a basis to apply the revised Guidelines to crimes committed before the revision so long as the pre- and post-revision crimes are prosecuted together but irrespective of the relationship, if any, between them.[10]

---

[9] The D.C. Circuit does not appear yet to have dealt with the situation with which we are faced here.

[10] The majority suggest that the Eighth Circuit has a similar rule based on that court's recent decision in United States v. Anderson, 570 F.3d 1025 (8th Cir. 2009), which the majority understands to "base[] its holding entirely on the application of the one-book rule."  Maj. Op. at 27 n.13.  I am not persuaded that Anderson stands for the proposition that the one-book rule alone is sufficient to overcome ex post facto problems inherent in sentencing a defendant under one version of the Guidelines for crimes committed both before and after that version came into effect.  The majority properly note that "the crimes at issue [in Anderson] were potentially subject to grouping under Guidelines section 2J1.6 and 3d1.2(c)."  Id.  But the crimes at issue in Anderson were not only "potentially" subject to grouping under the named sections; they were in fact

-18-

The majority take this position in a case in which the two sets of crimes, the substantive crimes and the coverup offenses, are in fact related -- indeed, they have been grouped together for sentencing purposes -- and no such broad holding is required for resolution of this appeal.[11]  As discussed in more detail below,

grouped under those sections.  See Appellee's Br., United States v. Anderson, Nos. 08-3402, 08-3436, 2009 WL 2819251 (8th Cir. Feb. 5, 2009) ("Per the grouping rules, the district court properly grouped the underlying wire fraud convictions with the failure-to-appear conviction and then applied the 'one-book rule' to the group.").  And while the language in that decision may be broad enough to suggest that the holding is based solely on the one-book rule, see Anderson, 570 F.3d at 1034 ("Pursuant to the one-book rule, because Anderson had been convicted of two offenses, the first -- wire fraud -- committed before, and the second -- failure to appear -- committed after, a revised edition of the guidelines manual became effective, the revised edition of the guidelines should be applied."), the decision was based entirely on case law pertaining to grouped offenses, see id. at 1033 ("We have held that the one-book rule does not violate the Ex Post Facto Clause, even when it results in a higher guidelines range, because defendants have 'fair warning' that the revised guidelines manual will apply to grouped offenses." (emphasis added)).  Because the decision in Anderson was rendered in a case involving grouped crimes and relied entirely upon precedent that applied only to grouped offenses, I remain doubtful that such language can be read as an affirmative holding on the ex post facto implications of the one-book rule.

[11] It is worth noting that the government repeatedly makes clear that it only argues that there is no ex post facto problem in this case because the crimes straddling the revision of the Guidelines are related.  See, e.g., Appellee's Br. at 45 ("[B]ecause the securities fraud and the obstruction constitute 'relevant conduct' vis-a-vis one another, application of the later Guidelines did not violate the Constitution." (citation omitted)); id. at 47 ("The grouping rules, together with the one-book rule, put the defendant on notice . . . ."); id. at 48 ("[T]his Court recognizes obstruction after-the-fact to be 'relevant conduct' to prior fraud."); id. at 50 ("Because these counts were properly grouped pursuant to § 3D1.2, the application of the 2005 Guidelines pursuant to § 1B1.11 did not violate the

I do not think the relationship of these offenses to be sufficiently close to conceive of them as groupable continuing offenses and therefore to overcome the ex post facto problem, but such a holding would at least acknowledge that there is a notice problem inherent in allowing a Guideline revised after a crime was committed to be used to sentence for that crime.

The majority seek to find in the one-book rule a form of constructive notice to defendants as to the consequences of their crimes because they knew at the time they committed any successive crime that the sentence for all prior completed crimes indicted together with the successor crime would be increased as a consequence of that successive crime. But the Ex Post Facto clause requires not only notice, but also that the notice be "fair."[12] In the case of Messrs. Kumar and Richards, it was not.

---

Ex Post Facto Clause.").

[12]

> Blackstone illustrates the second purpose of the Ex Post Facto Clause, providing fair warning, by looking to the policies of the Roman despot Caligula. See 1 William Blackstone, Commentaries on the Laws of England 46 (1765). Caligula had laws written in fine print and hung them high up on pillars so that they were not available to nor readable by the Roman citizens affected by such laws. Id. They provided no fair warning and so, like laws made ex post facto, they would not have provided citizens fair notice to refrain from the criminalized conduct.

United States v. Kilkenny, 493 F.3d 122, 126 (2d Cir. 2007).

I agree with the sentiments of Judge Kelly, of the Tenth Circuit, dissenting under somewhat similar circumstances: "[T]he only notice . . . provide[d to the defendants] at the time of commission of the . . . pre-amendment offenses is that the sentence could be determined in accordance with guideline provisions that may or may not be amended. Even if the notice is sufficient to inform a defendant that the last offense could determine the sentence, only a defendant with the prescience of a clairvoyant could anticipate an actual sentence based upon a yet-to-be amended guideline." United States v. Sullivan, 255 F.3d 1256, 1266 (10th Cir. 2001) (Kelly, J., dissenting).

Grouping

The majority and I agree that grouping is not determinative of whether the sentences here comport with the Due Process Clause. We reach this conclusion for different reasons, however. The issue of grouping of offenses affects the ex post facto inquiry, it seems to me, in at least two ways -- each relevant to the case at bar, and only one of which is acknowledged in the majority opinion.

First, there is considerable support for the argument that when offenses are grouped for sentencing purposes because "the behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior," U.S.S.G.

-21-

§ 3D1.2(d), ex post facto concerns are met. According to the Eighth Circuit, for example, "it has been held that applying the Sentencing Guidelines to a conspiracy that straddles the Sentencing Guidelines' effective date is not violative of the ex post facto clause. [Courts have] noted that with conspiracy and other continuing offenses it is the completion date of the offense that controls the version of the Sentencing Guidelines to be applied." Cooper, 35 F.3d at 1251 (emphasis added; citations omitted). This argument would support a finding of constitutionality despite the fact that the penalty prescribed for the crime is made harsher during the course of the criminal behavior because the defendants at least theoretically made a choice to continue their unlawful activity while the penalties for it were being increased.[13]

This is precisely the argument the government makes here, contending that the obstruction offenses are part of a "continuing course of conduct" with the fraud and conspiracy offenses. Appellee's Br. at 49. While I do not think this argument persuasive in this particular case,[14] I recognize that

---

[13] A similar argument, albeit a less convincing one, might be made to justify the use of a revised version of the Guidelines to sentence the repeated commission of the same crime committed both before and after the revision, as the Fourth Circuit did in Lewis and the Eighth Circuit did in Cooper. Such is not the case here. See Lewis, 235 F.3d at 218; Cooper, 35 F.3d at 1251.

[14] The argument that continuing offenses do not implicate ex post facto concerns might carry some day, but not this one. I do

-22-

the argument at least attempts to address the ex post facto problems inherent in applying a revised version of the Guidelines to the sentence of an act completed before the revision.  Had this been the basis of the majority's decision today, our disagreement on the law would seem to me to be a narrow one.

not think it proper to cast the abortive attempt to cover up the fraud and conspiracy several years later as a continuation of those crimes.  They were complete when the defendants' fraudulent and conspiratorial activity ended.  When the defendants engaged in fraud they likely hoped, even expected, to escape detection altogether.  That they did not, and later engaged in obstruction of justice to try to avoid further exposure and thereby criminal prosecution, does not seem to me to be a part of the original criminal activity.

I think it significant in this respect that the obstruction and fraud/conspiracy offenses were grouped together under Section 3D1.2(c), and not 3D1.2(d). (The fraud and conspiracy offenses were in fact grouped with each other under Section 3D1.2(d), but these offenses were then grouped with the obstruction offenses under Section 3D1.2(c)).  These two sections govern different kinds of conduct and have distinct implications for ex post facto analysis.  Grouping a continuing offense under Section 3D1.2(d) may not cause ex post facto concern where crimes are grouped because "the behavior is ongoing or continuous in nature," and therefore the crimes are arguably not completed until after the Guidelines are revised.

But there is no such implication of continuation under Section 3D1.2(c), invoked here, which requires grouping "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."  U.S.S.G. § 3D1.2(c).  That fraud and obstruction offenses share an offense characteristic or may lead to an adjustment to the sentence for one another has no bearing I can see on whether the fraud offenses can be understood as continuing through the time that the Guidelines were revised.  In this case, as I have tried to explain, the fraud cannot be so understood.  The fact that the two sets of crimes were grouped together under this section of the Guidelines has no implications with respect to the notice the defendants received of the consequences of their conduct committed before the Guidelines were revised.

-23-

But the majority appear to view the impact of grouping in a second fashion instead, one that has indeed been endorsed by several of our sister circuits. It was expressed explicitly by the Seventh Circuit in Vivit: "[T]he adoption of the one-book rule and the grouping rules put[s] criminals on notice that 'the version of the sentencing guidelines in effect at the time he committed the last series of grouped offences will apply to the entire group.'" Vivit, 214 F.3d at 918 (quoting Kimler, 167 F.3d at 895). Before they violated the securities fraud and conspiracy laws, the defendants "knew" the Guidelines sentence at the time, but they also "knew" that it could be increased if they later committed an offense -- in this case obstruction of justice -- that would be grouped with it.

The majority base their unique holding on the one-book rule rather than the grouping theory described here, but the two analyses bear similarities: The one-book rule as applied here is constitutional because the Guidelines provide notice that the law is subject to change. Even if they do not provide notice of what that change will be at the time an act is committed, they provide such notice before a subsequent act. Whether this analysis is conducted under the grouping rules or the one-book rule seems largely beside the point to me. In either event it permits notice that is insufficient under the observation in Miller that "[t]he constitutional prohibition against ex post facto laws

-24-

cannot be avoided merely by adding to a law notice that it might be changed."  Miller 482 U.S. at 431.

This sort of compound, abstract notice hardly seems to me to be "fair" notice at the time the fraud and conspiracy crimes were committed of what punishment the defendants might receive if they misbehaved in that manner -- giving notice only that if they did what they did, and later committed another (potentially "groupable") crime, their sentence could be increased by some unknown amount.  I am reminded again of Judge Kelly's reference to the "defendant with the prescience of a clairvoyant [who alone] could anticipate an actual sentence based upon a yet-to-be amended guideline."  Sullivan, 255 F.3d at 1266 (Kelly, J., dissenting).  It is, in short, speculative and incomplete notice and therefore not "fair."

Recidivism Cases

The majority reason by analogy to decisions, including those of the Supreme Court, upholding recidivism statutes -- those that punish crimes committed by a person with a specified level of criminal record more harshly than those committed by a person without such a record.  "The one-book rule," the majority say, "when it leads to a higher sentencing range than would be applied to a single offense, operates in a manner similar to that of the recidivist statutes and 'three strikes' laws upheld by the Supreme Court and our sister circuits in the past."  Maj. Op. at

32. They cite <u>Gryger v. Burke</u>, 334 U.S. 728 (1948), as having "rejected the defendant's argument that the consideration of his past offenses in determining his sentence for a later offense was foreclosed by the <u>Ex Post Facto</u> clause. <u>Id.</u> at 732." Maj. Op. at 32.

The majority then assert that "[t]he fact that the impetus for enacting the recidivist statutes was to reflect the greater culpability associated with the latter offenses, whereas the impetus for the enactment of the one-book rule is to avoid 'piecemeal' sentencing is of no relevance for the purposes of determining the retroactivity of the legal consequences of the defendant's actions." Maj. Op. at 33 (citation omitted). The majority therefore conclude that "the distinction between the recidivist statutes and the one-book rule makes neither a practical nor a logical difference for purposes of an analysis under the <u>Ex Post Facto</u> clause," because "the defendants' obstruction offense is the 'actual crime' triggering the application of the one-book rule, the defendants had prior notice of the consequences of that crime, and therefore the application of the one-book rule is proper." Maj. Op. at 34-35.

I think, to the contrary, that there is a crucial difference between the legislative branch deciding that a particular crime is more serious when committed by -- and that the public is in need of more protection from -- a person who has

-26-

a specified level of past criminal behavior than someone who does not, and increasing a penalty for a completed crime "triggered" by the commission of a subsequent one -- indeed, irrespective, in the majority's view, of whether there is a connection between those crimes committed before the change and those committed afterward. Justice Jackson, writing for the Court in <u>Gryger</u>, put it thus:

> Nor do we think the fact that one of the convictions that entered into the calculations by which petitioner became a fourth offender occurred before the Act was passed, makes the Act invalidly retroactive or subjects the petitioner to double jeopardy. <u>The sentence as a fourth offender or habitual criminal is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.</u>

<u>Gryger</u>, 334 U.S. at 732 (emphasis added).

The later crime may, as the majority say, "trigger" the change in the sentence for the earlier crimes, but what it triggers is what the <u>Gryger</u> court said was improper: an "additional penalty for the[ir] earlier crimes." Whatever the trigger, the revisions increased the offense levels applicable to the earlier fraud and conspiracy crimes, not the later obstruction of justice offenses. The revisions added an increase based upon the amount of money lost by the victims of the fraud and conspiracy crimes; they expanded the loss table for the fraud and conspiracy offenses, not the obstruction of justice offenses,

-27-

by adding new categories for losses of $200 and $400 million; and they created a new 6-level enhancement for fraud, not obstruction of justice, involving 250 or more victims; and added a 4-level enhancement for violations of securities laws, not the obstruction of justice laws, by defendants who were officers or directors of public companies. See U.S.S.G. §§ 2b1.1(b)(2)&(b)(13); cf. Cooper, 35 F.3d 1248, 1251 (8th Cir. 1994) ("It is well settled that habitual offender statutes do not offend the ex post facto clause, even though such statutes impact imposition of an instant sentence in consideration of past criminal conduct. [Citing Gryger, 334 U.S. at 732.] The enhanced sentence is considered to impose a stiffer penalty for the latest crime, which is considered to be an aggravated offense due to its repetitive nature." (emphasis added)). This is, of course, the critical difference between recidivist statutes and the circumstances we are faced with here: that while, as the majority point out and as Gryger makes clear, "the consideration of [] past offenses in determining [the] sentence for a later offense" may be permissible for ex post facto purposes, Maj. Op. at **[32]**, it is the consideration of a later offense in determining the sentence for past offenses, as we do here, that runs afoul of ex post facto considerations.

As a "practical" matter, to be sure, Congress, or perhaps the Sentencing Commission, might have -- and may still --

-28-

adopt a permissible recidivism statute to cover a circumstance very much like the present one: A person who commits an obstruction of justice in order to cover up a fraud in which the losses inflicted by the fraud are $ X will receive a Y level increase in offense level. It does not follow, "logically" or otherwise, that reaching a similar result by the present method -- by retroactively increasing the punishment for fraud -- is constitutional. The hypothetical law would provide punishment for behavior of which the potential violator would be fully and fairly warned before engaging in that behavior. It would reflect the perceived seriousness of future obstruction offenses, publically disseminated before any such offense is committed, and not an attempt to re-punish completed past acts. To increase the punishment for fraud and conspiracy after they are completed provides no "fair notice" and evokes "the inherent injustice associated with retroactivity itself." Sash, 439 F.3d at 64.

CONCLUSION

We have been instructed for more than 200 years that "a law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" violates the Ex Post Facto clause. Calder, 3 U.S. at 390. That seems to me to describe the change in the Guidelines that was applied to the defendants' fraud and conspiracy crimes upon sentencing long after those crimes had ended.

-29-

Again, I have no reason to doubt that the Guidelines Commission may promulgate obstruction of justice guidelines that take into account the gravity, as it then views the gravity to be in the context of the crime for which punishment is being evaded, so as prospectively to prescribe harsher sanctions for the obstruction. But then it must prescribe those sanctions to the obstruction itself and not to crimes that are over. I think that to be a violation of the Ex Post Facto clause.

For the foregoing reasons and to the extent indicated, I respectfully dissent.